Petition of NORTH ATLANTIC TRANS-
PORT CO., Inc.
THE CHAGRES.

Petition of UNITED STATES.
THE REIGH COUNT.

United States District Court
S. D. New York.
March 25, 1948.

John F. X. McGohey, U. S. Atty., of New York City (George C. Sprague, Sp. Asst. to Atty. Gen., and Allan A. Baillie, Sp. Atty., of New York City, of counsel), for the United States.

Kirlin, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and John F. Gerity, both of New York City, of counsel), for the Chagres.

LEIBELL, District Judge.

These proceedings in Admiralty arose out of a collision in a fog off the coast of Newfoundland, not far from Halifax, between the S. S. Reigh Count and the S. S. Chagres at about 4:20 on the afternoon of June 5, 1943. The Chagres was damaged and the Reigh Count was sunk with her cargo. Both vessels were members of a convoy which was supposed to be proceeding in a single line to a point where, weather permitting, the convoy was to form up on a voyage to the United Kingdom.

On August 31, 1943, the North Atlantic Transport Company, Inc., as owner of the Chagres, and the United States Lines as bareboat charterer of the Chagres, filed a petition for exoneration from or limitation

of liability [1] for the sinking of the Reigh Count. An ad interim stipulation for value in the sum of $671,311.97 with interest at 6% from June 5, 1943, representing the total aggregate value of the petitioners' interest in the Chagres and her pending freight, was filed with the petition. The petition alleged that before the commencement of the voyage on which the collision occurred the owners and the charterers had exercised due diligence to make the Chagres seaworthy and that she was seaworthy and fit for the voyage at the time of the collision. It was further alleged that the collision and the damages resulted therefrom were not caused or contributed to by any fault or negligence on the part of the Chagres but were due solely to the fault and neglect of the Reigh Count in that:

"1. She was not in charge of competent persons.

"2. The persons in charge of her were not attentive to their duties.

"3. She was not maintaining a proper, alert, and efficient lookout in the existing conditions of weather.

"4. She negligently failed to comply with the official instructions issued by the Naval Control Officer, as referred to above, by failing to maintain her assigned position properly in the aforesaid single line formation.

"5. She negligently failed to maintain the course which she should have maintained in carrying out the instructions of the Naval Control Officer.

"6. She negligently failed to blow proper fog signals.

"7. The persons in charge of her negligently failed to heed or hear the fog signals of the Chagres or of the other vessels which were proceeding ahead of the Chagres.

"8. The persons in charge of her failed to heed the fact indicated by the fog signals of the Chagres and other vessels ahead of her that the Reigh Count was not on a proper course and was approaching and crossing the path of the convoy vessels already steering on the 075° true course;

and thereupon negligently failed to stop and reduce her speed to avoid crossing the path of those vessels and to relocate herself properly in the single line ahead formation.

"9. She did not sight the Chagres or the navigating lights of the Chagres as soon as she should have, and negligently failed to maneuver promptly when she did sight them, or negligently failed to take immediate steps or action to avoid the collision.

"10. She negligently failed to avoid crossing the prescribed convoy course which the Chagres was following and which the persons in charge of the Reigh Count knew or should have known.

"11. She was not in proper and seaworthy condition or was not equipped with proper and sufficient pumps and suctions and failed to take proper steps to remain afloat after the collision occurred."

It was also alleged that, if the collision and damage were not due solely to the fault and negligence of the Reigh Count, they "were due to and incurred by reason of unavoidable exigencies, hazards and perils of wartime navigation of convoys under governmental regulations and orders without any fault of the steamship Chagres and the persons in charge of her, or anyone for whom your petitioners are responsible, * * *."

The United States, as owner of the Reigh Count, filed a petition, on December 3, 1943, for exoneration from and limitation of liability for damages arising out of the collision between the Chagres and the Reigh Count. It was alleged that the petitioner—" * * * had in every respect exercised due diligence to make said vessel tight, strong and staunch, and in all respects seaworthy, and properly manned, equipped and supplied. Upon the commencement of the voyage on which the disaster occurred, and until the happening of the collision, hereinafter described, the said Reigh Count was, in fact, tight, strong and staunch and in all respects seaworthy and properly manned, equipped and supplied."

It denied any fault on the part of the Reigh Count and charged that the collision

---

[1] On July 29, 1943, the United States had filed a libel against the Chagres and the United States Lines Company, Inc. No answer was filed to this libel and the owners and charterers of the Chagres began the instant proceedings for limitation of liability.

was caused solely by the fault and negligence of the Chagres in that:

"1. She was not being navigated by competent persons;

"2. The officer or officers in charge of her deck were inefficient and inattentive to their duties;

"3. She failed to keep a proper and diligent lookout;

"4. Her helmsman was incompetent and and inattentive to his duties;

"5. She failed to maintain her convoy course;

"6. She failed to maintain her convoy position;

"7. She failed to maintain her convoy speed;

"8. She failed to adhere to the instructions issued for the guidance and safe navigation of the convoy;

"9. She failed to sound proper fog signals;

"10. She failed to take proper and reasonable steps to avoid collision;

"11. She did nothing to avoid the collision;

"12. She was unseaworthy in respects material to the collision."

The Reigh Count petition also alleged that:

"The steamship Reigh Count was sunk as a result of the aforesaid collision and she and her cargo and equipment became a total loss, except that a portable lifeboat radio transmitter was saved and was ultimately delivered to a representative of your petitioner at Courock, Scotland. The value of said radio transmitter in new condition did not exceed the sum of $315.00 and its value in seaworn condition was much less, but cannot at present be accurately determined. The value of the Reigh Count upon the termination of her voyage did not exceed the sum of $315.00. The major part of the cargo on board the Reigh Count belonged to the petitioner and was carried for war purposes, and as to this cargo there was no pending freight. The balance of the cargo was likewise carried for war purposes and was consigned to various agencies and instrumentalities of the Government of the United Kingdom of Great Britain and Northern Ireland. The pro forma freight for this cargo amounted to $13,894.81 but was neither paid by nor charged to the shipper or consignee thereof, but was charged to petitioner's Lend Lease Administration, so that to this cargo also there was no pending freight."

On December 31, 1943, the North Atlantic Transport Company, Inc., as owner, and the United States Lines Company, Inc., as charterer of the Chagres, filed a claim in the government's limitation proceeding for the sum of $100,000 for damage to the Chagres caused by the collision with the Reigh Count. On the same day they also filed an answer to the petition of the United States for exoneration from and limitation of liability denying the seaworthiness of the Reigh Count, denying any fault or negligence on the part of the Chagres, denying the government's right to limit liability, and alleging as a separate defense the fault and negligence of the Reigh Count substantially as alleged in the Chagres' petition for limitation of liability.

Thereafter, on June 1, 1944, the United States, as owner of the Reigh Count and part of her cargo, and as insurer and bailee of the remainder of her cargo and mail, filed its claim in the Chagres proceeding in the total sum of $4,711,372.12. On the same day the government also filed its answer to the petition of the Chagres for exoneration from and limitation of liability in which it denied the allegations of the exercise of due diligence to make the Chagres seaworthy, denied any fault or negligence on the part of the Reigh Count, and alleged that the fault of the Chagres (as set forth in the United States petition for limitation of liability) was the cause of the collision.

At the end of the consolidated trial of the limitation proceedings the Court reserved to the United States the right to move to amend, in certain respects, its petition and answer in the respective proceedings until the time for the filing of briefs, at which time the government moved to amend its petition by adding the following allegations to Article Six of its petition:

"13. She (the Chagres) failed to sound one short blast on her whistle as required by Article 28 of the Rules when she turned to starboard.

"14. She failed without reasonable cause to stand by the Reigh Count after the collision and to render assistance to the Reigh Count, her master, officers and crew, from the dangers caused by the collision; she likewise failed to give to the master of the Reigh Count her name and port of registry, and port to which she belonged, and the name of the ports and places from which and to which she was bound, as required by statute."

The motion to amend is granted.

The Reigh Count was a single screw shelter deck ship with freeboard. She was 400 feet in length, 52.1 feet in beam and 27 feet in depth, and of 4,657 tons gross. She was built in 1907 at Newcastle, England, and prior to our entry into World War II was under the Italian flag. At the time of the collision she flew the flag of the Republic of Panama. She was classed 100—A1 by Lloyd's and A1, A. M. S. by the American Bureau of Shipping. On May 25, 1943, she sailed from New York with a full complement of officers and crew bound for Boston, Mass. via the Cape Cod Canal. She arrived at Boston on May 28, 1943, and on June 1, 1943, departed in convoy bound for Halifax, Nova Scotia, where she arrived on June 3, 1943.

The Chagres was a single screw two deck steamship, 410.5 feet in length, 54.3 feet in beam and 27.2 feet in depth, and of 5,592 gross tons. She was built in California in 1919, and, like the Reigh Count, flew the flag of the Republic of Panama. On May 27, 1943, she departed from New York bound for Halifax, Nova Scotia, via Boston, Mass. On June 3, 1943, she arrived in Halifax harbor.

The Chagres and the Reigh Count were part of a 51 ship convoy scheduled to depart from Halifax bound for ports in the United Kingdom on June 5th. The masters of both vessels attended a convoy conference on June 4th at the office of the Naval Control Officer at Halifax and received specific written instructions for departing from Halifax Harbor and for forming up the convoy. These Sailing Orders and Convoy Routeing Instructions provided that the vessels of the convoy pass through the gate or entrance to Halifax Harbor at specified times, at intervals of three minutes; that the vessels follow a single line formation in taking their departure to the point at which the convoy was to form up. The Instructions specified the speed at various points as well as the standard or convoy speed; the route to be followed as designated in points of latitude and longitude or by reference to certain navigational aids; the procedure in clear weather and in conditions of low visibility at the point where the convoy was to form up; and the usual provisions relating to rendezvous points and stragglers.

The following is quoted from the instructions:

"Convoy Routeing Instructions

"Section 'A'        SPEED 7.5 KNOTS
Ships are to proceed in single line ahead to disembark Pilots off Neverfail Buoy.

"Ships are to continue in Single Line Ahead adhering strictly to the following departure instructions.

*"Pass close west of Buoys in following positions:*

| | | | |
|---|---|---|---|
| Buoy 'A' | 44.30.45 N. | 63.30.15 W. | Red Con Fl. Red |
| Buoy 1 | 44 28.50 N. | 63.29.20 W. | " " " " |
| Buoy 2 | 44.27.00 N. | 63.28.33 W. | " " " " |

"Thence alter course to pass *close east* of Sambro Lt. Vessel.

"Thence within 4 cables east of a line joining the following positions (not marked by buoys):

| | |
|---|---|
| 44.21.45 N. | 63.24.20 W. |
| 44.07.55 N. | 63.16.20 W. |

*"Note:* Vessels Must on No Account Attempt to Form up Until This Position Has Been Reached.

*"Procedure in clear weather.*

"After passing position 44.07.55 N. 63.16.-20 W. convoy will form up by signal from Commodore. Vessels are then to take formation as previously arranged, adjusting speed by engines as necessary to remain on station. On being formed up, convoy will pass through ocean route positions as follows:—

| *Ocean Route:* | BD. 44.30 N. | 61.22 W. |
|---|---|---|
| | BE. 45.49 | 57.39 |
| | BF. 45.48 | 53.42 |
| | V. 45.46 | 46.25 |

*"Procedure in low visibility*

"If owing to low visibility convoy is unable to form up, vessels proceed at speed 7 K. in single line ahead on convoy route until such time as weather clears and convoy can be formed up."

"*Each Ship Must Keep To The Time Laid Down For Her* and must not be late in weighing anchor. It is better to be ahead of time than to be late. If any ship is delayed in weighing anchor she should put her distinguishing numbers at the dip (half mast) so that other ships will be warned that she is delayed."

■ The Routeing Instructions have the same force as law, Queen Ins. Co. of America v. Globe & Rutgers Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402; The Madiana, D.C., 63 F.Supp. 948; Tidewater Associated Oil Co. v. United States, D.C. S.D. Cal. 1945, 60 F.Supp. 376; The Vernon City, 70 L.L.Rep. 279 at p. 290. Violation of these instructions by either vessel would burden it with the duty of showing that such violation could not have contributed to the collision. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148.

The Chagres (#33) passed through the gate in Halifax Harbor at 11:30 A.M., six minutes ahead of her scheduled time of 11:36 A.M., and proceeded southerly toward Neverfail Buoy to disembark her pilot. She was following #72, a British tanker. The Reigh Count (#103) passed through the gate at 11:57 A.M., nine minutes ahead of her scheduled time of 12:06 A.M. and likewise proceeded to Neverfail Buoy to disembark her pilot. Both ships were steaming in column formation, single line ahead. The Reigh Count was following the Jean, designated as number 123, although the Sailing Orders provided for her to follow the Fana, number 113. But these variations by both vessels from the departure schedule set forth in the Sailing Orders were not violations of the orders. Captain Banyard, Senior Naval Control Service Officer in charge of merchant shipping entering and leaving the Port of Halifax, who supervised the issuance of the Sailing Orders, testified that the schedule of departure was very seldom lived up to because of ships having windlass or other trouble. Under such conditions another ship would take her position, to avoid delay of the whole convoy.

After disembarking her pilot off Neverfail Buoy the Chagres proceeded along the designated route in single line ahead formation following astern of the vessel ahead of her until at 1:45 P.M. she passed Sambro Light Vessel (located at 44° 21' 50" N, 63° 25' 41" W, which was several hundred yards from its chartered position), close aboard to starboard, distant about 400 feet. Fog had begun to set in at Buoy No. 2, about 5½ miles above Sambro Light Vessel, and the Chagres streamed her fog buoy following similar action by the vessel directly ahead of her. At that time, about 1 P.M., visibility had been reduced to about 1500 feet, and at 1:45 P.M., when the Chagres was in the vicinity of Sambro Light Vessel, visibility was still about the same. The Chagres took her departure from Sambro, setting a course of 155° T and maintaining a speed of about seven (7) knots, following the vessel ahead of her. She proceeded toward a point designated as 44° 07' 55" N, 63° 16' 20" W, about 15½ miles distant from Sambro Light Vessel, at which point the convoy was to turn left to course 075° and form up for the first leg of the ocean route, if the visibility was good. The Instructions above quoted provided that if, at this point, because of low visibility, the convoy was unable to form up, the vessels were to proceed at a speed of 7 knots in single line ahead formation on convoy route until such time as the weather cleared.

After proceeding on course 155° T for about 3½ miles the fog became dense and visibility was reduced to 400 feet or less. The Chagres lost visible contact with the vessel immediately ahead of her, and of that vessel's fog buoy which had been streamed at least 250 feet astern. In such circumstances it was necessary for the Chagres to ascertain her own position by dead reckoning and by whatever aid she could derive from the sound signals of other vessels. The testimony of the Chagres, with respect to her progress along this route, is to the effect that at all times she heard the regulation fog signals of one blast every two minutes dead ahead and astern of her until just before 4:00 P.M.,

the time at which her master had calculated she would arrive at the turning point; that she began to hear whistle signals blowing S075 in Morse Code from dead ahead; and that as she proceeded on her course these whistle signals once again sounded regulation fog signals and were drawing off to port, while astern of her, the Chagres continued to hear the regulation fog signals. At this time, 4 P.M., when by calculation and by observation of the sound signals the Chagres estimated that she was at the turning point, she did not execute a left turn to 075°T but continued on course 155°T for ten minutes longer, in order to be sure the turning point had been reached. About 4:10 P.M. the Chagres sounded S075 in Morse Code on her whistle and executed a turn to 075°T under an easy port rudder and steadied on that course at 4:15 P.M. Members of her crew, testified that the Chagres, while making the turn, heard the fog signals of the vessels in line ahead, which had previously drawn off to port, come back ahead or fine on the port bow of the Chagres, and the signals of vessels which had been following in line astern began to bear off the port quarter, and that these facts indicated that the Chagres was maintaining her position in the single line while making her turn. How this could be unless those vessels also delayed turning until well beyond the turning point is not clear. After having steadied on course 075°T the Chagres proceeded at 7 knots until 4:20 P.M. when the Master of the Chagres observed the plating of a ship, the Reigh Count, off the port bow of the Chagres, distant about 400 feet and proceeding across his bow from port to starboard at an estimated speed of 7 knots. The Master of the Chagres immediately ordered the engines astern at full speed and the rudder hard right. These orders were apparently executed promptly, the bow of the Chagres moving two or three points to starboard. About one minute after the sighting, the bow of the Chagres struck the starboard quarter of the Reigh Count, at a point about 60 feet forward of the latter's stern.

The Routeing Instructions provided for the vessels of the convoy to alter course to pass close east of Sambro Light Vessel.

Thence within 4 cables east of a line joining the following positions (not marked by buoys) 44.21.45 N, 63.24.20 W; 44.07.55 N, 63.16.20 W. In plotting this portion of the Instructions it is apparent that the language "within four cables east of a line" joining two designated points requires the plotter to draw a line parallel to the line between the designated points and distant therefrom 2400 feet to the east to set the limit of "within 4 cables," thus forming a channel between the points designated in the Routeing Instructions extending from the vicinity of Sambro Light Vessel, about one mile to the eastward thereof, to the point at which the convoy was to turn to 075°T onto the ocean route. The course from the entrance to this channel to the end thereof, the turning point, was 157°T. This is the natural construction of the Routeing Instructions and it is supported by the interpretation given by Captain Banyard. In this respect it should also be noted that a permanent, buoyed channel was later set up in the same position as the channel designated in the Routeing Instructions herein.

It is contended by the government that the Routeing Instructions required the ships of the convoy to proceed to a point about ¼ mile east of Sambro Light Vessel, execute an 80° turn to port and proceed for ¾ths of a mile to the entrance to this channel and then execute an 80° turn to starboard and proceed down the channel. This would be a difficult and cumbersome maneuver even in clear weather for heavily laden cargo vessels of a 51 ship convoy traveling in single line ahead formation at 7½ knots. There is no evidence that any of the vessels in the convoy actually made this maneuver. Neither the Chagres nor the Reigh Count did so, nor did the vessel each was following at that point.

The Chagres made and departed from Sambro Light Vessel at a point about 400 yards due east thereof and proceeded on a direct course of 155°T toward the turning point. This course obviously carried her outside and westward of the four cable channel irrespective of whether she was affected by a westerly current. Apparently she was never in the channel. Such a course was not in conformity with the

Routeing Instructions. However, the Chagres cannot be charged with fault in this respect at the time she passed Sambro Light Vessel for proceeding to the westward of the four cable channel on course 155°T, because she was then following the vessel ahead of her.

Section "A" of the Routeing Instructions provided that:

"Ships are to proceed in single line ahead to disembark pilots off Neverfail Buoy.

"Ships are to continue in Single Line Ahead adhering strictly to the following departure instructions."

The provision as to maintaining position in single line formation was emphasized in the Instructions and it is apparent that other provisions thereof were to be subordinate to that provision. We may assume that the Convoy Commodore was aware of the Routeing Instructions and that he would direct the leading ship in accordance with them. It was the duty of the other ships in column to follow the ship ahead in single column. At the time the Chagres passed Sambro Light Vessel it appears that she was complying with what was a superior requirement of the Routeing Instructions.

However, fog had set in at this time reducing visibility to ¼ of a mile so that only one or two ships ahead of the Chagres were visible to her lookouts or the Master. There were approximately ten or eleven vessels between her and the lead or guide ship and she had lost visible contact with that ship and the rest of the column ahead, except the one or two vessels preceding her. After following the vessel ahead for a half hour, for about 3½ miles along the 15½ mile route to the turning point, the fog closed in and visibility was reduced to about 400 feet and the Chagres lost sight of the fog buoy of the vessel directly preceding her.

Under any set of circumstances however it is apparent from the testimony and from an examination of the chart used by the Chagres that she was relying on following the vessel ahead of her, and when the fog came in and she lost visual contact with the vessel ahead, she was inadequately prepared to navigate the four cable channel to the point where she was to execute the left turn to the ocean route by dead reckoning alone. This was an eventuality for which she should have been prepared by accurately plotting her departure from Sambro Light Vessel and fixing her position at various intervals along the D. R. Track, plotting the limits of the four cable channel and being prepared to move into it, if she lost visible contact with the vessel ahead.

The course the Chagres had set, 155°T, did not carry her down the four cable channel. It was the course she was steaming in single line ahead under favorable conditions of visibility, but it was not the proper course to navigate the channel. If she continued on that course when she lost visible contact with the other ships, she was certain to be in difficulties when it came time for her to execute the turn to 075°T. She then would have to cut across the end of the channel at right angles to proceed on her new course. That would be a dangerous maneuver with other vessels making the turn at or near the channel exit. The following language in Royal Hellinic Gov't v. Aegeus, 77 L.L.Rep. 212, 215 is illustrative of the Chagres fault in this respect:

" * * * a ship in convoy in fog is under a strict duty to follow the ship ahead of her to the best of her ability and this she can only do by keeping contact and in position by maintaining the same course and speed as her leader. Once she loses touch with her leader, especially in fog, the difficulty of regaining position and the risk of collision are great."

This was not the only respect in which the Chagres violated the Routeing Instructions. Her testimony asserts that she was making a speed of seven knots from Sambro Light Vessel to the turning point. Her master calculated his arrival at the turning point on the basis of a seven knot speed and her testimony with relation to her engine revolutions indicates that she was making 60 r. p. m. which, according to her engine revolutions scale, would give her a 7 knot speed. A check on the times of passing and the distance covered between Buoys "A," "1," "2" and Sambro Light Vessel apparently made by the master of the Chagres supports her contention that

she was making seven knots speed. The Routeing Instructions however required that the ships in the convoy maintain a speed of 7½ knots from Sambro Light Vessel to the turning point and this requirement was not altered by the fact that the visibility had been affected by fog on this course to the turning point.

At the top of the Routeing Instructions the following phrase appears: *"Speed 7.5 Knots."* After designating the turning point onto the ocean route in latitude and longitude, the Instructions state: *"Note:* Vessels Must on No Account Attempt to Form up Until This Postion Has Been Reached"; and in a later paragraph following the designation of the positions along the ocean route under the caption *"Procedure in low visibility"* appears the following language: "If owing to low visibility convoy is unable to form up, vessels proceed at speed 7 K. in single line ahead on convoy route until such time as weather clears and convoy can be formed up." In paragraph 8 of the Sailing Directions the following appears: *"Speed of Ships * * ** After dropping Pilot in accordance with Routeing Instructions and as ordered by the Commodore." It does not appear that any orders in relation to speed had been issued by the Commodore. The general provision of the Routeing Instructions requiring a speed of 7.5 knots was in force. The provision as to speed in low visibility did not apply until after reaching the position for forming up, i. e. after making the left turn onto the ocean route (course 075°T). That is the only interpretation which the language of the Routeing Instructions reasonably permits and it is supported by the testimony of Captain Banyard. The war hazards at that stage of the voyage may well have been such that it was advisable to maintain the 7½ knot speed even at low visibility. The Chagres speed of 7 knots was ½ knot less than the speed required by the Routeing Instructions on the route from Sambro Light to the turning point. She was at fault in not maintaining the prescribed speed.

The Reigh Count, whose speed seems to have been maintained at about 7.44 knots, took her departure from Sambro Light Vessel ½ hour after the Chagres and, assuming the Chagres speed to be 7 knots, about 3½ miles astern of the Chagres. If the Chagres had been making the required speed, even though she had deviated to the west of the four cable channel course and even though she had proceeded for about ten minutes beyond the turning point, she would have passed the Reigh Count by at least a distance of one mile in the vicinity of the turning point. The distance the Chagres traveled beyond the turning point was about one mile, and the distance from the point at which she executed her turn to the point of collision was also about one mile. The difference of .44 knots in the speeds of the respective vessels operated to permit the Reigh Count, over a period of 2¼ hours, to close the distance by an additional mile.

The officers of the Chagres testified that she proceeded beyond the point at which she was to make the turn, for about ten minutes. If they did that, the Chagres went beyond the turning point by at least a mile. Apparently her officers knew that she was so far to the West of the channel that if she turned left on a course of 075°T, at the time for making that turn she would have cut into vessels making a left turn at the channel exit. Thus her failure to move over into the channel when she lost the fog buoy of the vessel ahead and her maintenance of the 155°T course for another 12 miles forced her to continue a mile beyond. She did not turn at the turning point and that was a fault. The Robert F. Hand, 73 L.L.Rep. 245. All these faults of speed and course eventually brought her to the position where she collided with the Reigh Count, and they are chargeable to her as faults contributing to the collision.

The testimony as to the navigation of the Reigh Count discloses the same reliance on visible contact with the other ships of the convoy that guided the master of the Chagres. The charts used by the Reigh Count, her logs and papers were lost with the ship on June 5, 1943, and the evidence concerning her navigation is primarily found in the report of her master, and other officers made at Halifax the day after the collision and in the testimony of her master, Captain Bordal, taken by deposition on May 29, 1946, about three years later.

Captain Bordal had been following the sea for twenty-three years. From 1933 until 1939 he served as Chief Mate and Master in the whaling service. From 1939 to 1943 he served as Chief Mate and Master on various cargo ships, sailing mostly between the United States and South America. On May 22, 1943 he joined the Reigh Count and on May 24, 1943 he relieved the Chief Officer then on board. The Reigh Count departed from New York on May 25, 1943 and after making Boston, Mass. on May 28, 1943, she arrived, in convoy, in Halifax Harbor on June 3, 1943. Her master, Captain Jensen, became ill and Bordal was promoted to Master by the War Shipping Administration on June 4, 1943. He then attended the Convoy Conference where he received his Sailing Orders and the Routeing Instructions.

Captain Bordal asserts that he plotted the various positions noted in the Routeing Instructions, the courses to be traversed from each point and the times of arrival thereat together with the speeds to be made good. The assertion is supported by the testimony of the Chief Officer, Duprez, and Third Officer, Lyse, who were present when the master went over the Routeing Instructions and the charts. At the time of his deposition Captain Bordal could not recall the courses he had laid out. A diagram prepared by him and used on the taking of his deposition (Ex. XI–18) shows that he correctly interpreted the directions with respect to the four cable channel, although it does not appear that he actually laid out a line parallel to the line between the points designated in the Routeing Instructions and distant therefrom 4 cables, so as to delineate the eastern boundry of this channel.

The Reigh Count's course after leaving Halifax Harbor at 11:57 was to Neverfail Buoy, where she disembarked her pilot. She then proceeded along the designated route until her arrival off Sambro Light Vessel at 2:15 P.M. A heavy fog had set in at this time and the Reigh Count passed close east of the light vessel leaving it about 300 feet to starboard. Within a few minutes of such passing the Reigh Count set a course of 150°T following close astern of the vessel (#123) next ahead of her in the

single line formation. This was not the course laid out by Captain Bordal at Halifax but in examining the chart he ascertained that this course (150°T) would eventually cut across the western boundary of the four cable channel and unless changed would arrive in the vicinity of the turning point about one mile to the eastward of the western boundary of the four cable channel. He realized that this was not in compliance with the Routeing Instructions but resolved to follow the vessel next ahead in line in the formation in compliance with the superior provisions in the Routeing Instructions in relation to maintaining position in the single line ahead formation. This was the action taken by the Chagres at Sambro Light Vessel. The situation of a Master of a vessel in the convoy, upon reaching Sambro Light Vessel and attempting to comply with the Routeing Instructions, is expressed in the language of Captain Bordal as follows:

"Q. By 'this line' you mean four cables east of the line connecting the two located positions of latitude and longitude. A. Yes. We had to go over to this one way or the other. (Indicating B) As long as there were no instructions how to get over to this line, that really gave you a very wide margin because you could go straight from the point and you could cross it midway or cross it earlier, but you couldn't do just as you pleased because there were too many ships. If they had started crossing whenever they felt like it they certainly would have been in a mess and there wouldn't have been any line at all. That is one reason why I followed the ship ahead."

"Q. Now, in the convoy instructions, Government's Exhibit 17 for Identification, page 5, I am referring to the page marked 5, which is actually the fourth page of the photostatic, and at the top of the page it says, and I quote: Immediately following the instruction to pass close east of Sambro Lightvessel, it says, 'Thence within four cables east of a line joining the following positions not marked by buoys, 44 degrees, 21 minutes, 45 seconds north; 63 degrees, 24 minutes, 20 seconds west; second position, 44 degrees, 7 minutes, 55 seconds north; 63 degrees, 16 minutes, 20 seconds

west.' A cable is 600 feet, isn't it? A. Yes.

"Q. And four cables would be 2400 feet, wouldn't it? A. Yes.

"Q. Did you fix the position on your chart of this first position, 44, 21, 45 north; 63, 24, 20 west? A. Yes.

"Q. How was that with reference to the position of Sambro Lightvessel? A. That was east of Sambro Lightvessel.

"Q. How far east of Sambro Lightvessel, approximately? A. A little more than a mile.

"Q. It was farther east than your position when you passed Sambro Lightvessel? A. Yes.

"Q. Three hundred feet off; is that right? A. Yes.

"Q. Did you also fix the position on your chart at the time of the second position, 44 degrees, 7 minutes, 55 seconds north, 63 degrees, 10 minutes, 20 seconds west? A. Yes.

"Q. And did you draw a line between those two? A. Yes.

"Q. And 2400 feet east of that was the distance, was the line that you were to follow; is that right? A. Yes.

"Q. When you found that you were so close to Sambro Lightvessel, that is 300 feet, what did you do as Master, or determine to do with reference to the course in order to comply with this provision which I have just read to you from the instructions, to keep four cables east of a line joining these positions? A. The instructions called for us to follow vessel No. 123. He in turn followed the one ahead of him, so when we were out of port—not out of port, but they didn't say in the instructions to go direct to that point without any chart, but 123, his course would bring us east of that line later on."

"Q. Now, Captain, in your opinion passing Sambro Light ship at a distance of three hundred feet to the East, would you have complied with your instructions as you understood them for the convoy by following a course of 155 degrees? [The 155°T course was that followed by the Chagres.] A. 155 degrees would have brought us East of that line.

"Q. Do you mean east of the line? A. Pardon me, west of the line.

"Q. West of what line? A. The line we were supposed to be on the east side of.

"Q. That is a line four cables east of a line connecting the two fixed positions? A. That's right.

"Q. By following a course of 150 degrees true, I take it from your illustrative diagram, Government's Exhibit 18 for Identification, that you were first west of that four cable line and eventually came slighly east of that line? A. Yes.

"Q. In your opinion was that a substantial compliance with the convoy instructions? A. The convoy instructions said 'close to Sambro Light ship and thence put out to position' and we were supposed to follow a line east of that line drawn between those two positions, but it was impossible.

"There were no instructions, so far as I can recall to go straight over to this line and the ship ahead of me didn't do it anyway. He was steering 150 and we were steering 150 after him, and I figured that course would be alright."

The Routeing Instructions did not give any specific directions on how to get from Sambro Light Vessel to the northerly entrance of the four cable channel. Interpreted as requiring entrance at the northerly end, the vessels would have made a left turn off Sambro Lightship and after proceeding about a mile a right turn into the channel. This was a problem for the Convoy Commodore to resolve in the lead or guide ship. Both the Chagres and the Reigh Count were entitled to rely on the single line ahead provisions of the Routeing Instructions, in taking their departure from Sambro Light Vessel, each following the vessel next ahead.

After passing Sambro Light Vessel the Reigh Count proceeded toward the turning point at the end of the channel about 15½ miles away, following the vessel next in line ahead of her, by observing her fog buoy which had been streamed after passing Buoy No. 2. According to Captain Bordal:

"We kept as close to the fog buoy as possible, due to the very heavy fog, and kept it

a little on the port side, very fine on the port side."

The Reigh Count kept this fog buoy in sight for almost the whole length of the route from Sambro Light Vessel toward the turning point. The Third Mate testified that the fog buoy was last sighted by him seconds before visible contact with the Chagres was reported. That hardly seems possible. The bow lookout (Dietrich) who was stationed in the eyes of the Reigh Count, also testified that he saw the fog buoy ahead 3 or 4 minutes before the Chagres was sighted, and that that was the last time he heard the ship ahead. The helmsman (Leyden) saw the fog buoy of the ship ahead before he went into the wheelhouse to take over the wheel for his 4:00 o'clock watch. The report made by the Master and others at Halifax on June 6th was that the Reigh Count was "following astern of vessel No. 123 until 10 minutes prior to collision, at which time there were several vessels in the immediate vicinity."

■ The Reigh Count's speed during this time, from Sambro Light Vessel to the vicinity of the turning point was about 7.44 knots. The Reigh Count sighted the Chagres at about 4:20 P.M. after having steamed a distance of 15½ miles from Sambro Light Vessel which she passed at 2:15. Her actual speed thus appears to have been in conformity with the 7½ knot requirement of the Routeing Instructions. Captain Bordal testified that he had figured the times on the chart on the basis of a 7½ knot speed. While being questioned concerning the Routeing Instructions he testified that he thought the speed during this leg of the voyage should be seven knots. The Third Officer expressed the same opinion. Despite this view of the Instructions at a date three years after the collision, it is apparent that on the basis of time and distance the Reigh Count actually made better than 7 knots, that she made about 7.4 knots, which was a substantial compliance with the Routeing Instructions.

At or about 4:20 P.M. a stern gunner on the Reigh Count observed the Chagres on the starboard side and reported it to a talker on the bridge, or just above the bridge, who relayed the report to the Master. At about the same time the lookout on the starboard wing of the bridge reported the presence of the Chagres to the Master. Captain Bordal was on the port wing of the bridge and it appears that he leaned over the forward rail of the bridge to see the position of the Chagres.

■ Captain Bordal saw the Chagres closing on his starboard side about "4 or 5 points" off the starboard bow, distant about four to six hundred feet. He hurried through the pilot house to the starboard wing of the bridge to note any turning movement on the part of the Chagres. It was better to "thus gain the information which could enable the best possible last minute action to be adopted, rather than take action upon imperfect knowledge which might turn out to be harmful rather than helpful". The Vernon City, supra. He then ordered the wheel hard right (hard to starboard), one blast sounded on the whistle, and full speed ahead on the engine order telegraph. These orders were properly complied with and the stern of the Reigh Count began a swing to port. A starboard turn by the Reigh Count to clear her stern from the danger presented by the Chagres approaching the starboard was proper. The British Resource, 68 L.L.Rep. 5, affd. 70 L.L.Rep. 93. The testimony of the Chagres is to the effect that the stern of the Reigh Count appeared to be swinging to starboard; but the Chagres was also swinging, a fact which would make observation of relative movements highly difficult. A "very, very short time" after the hard right rudder was put on, the Reigh Count and the Chagres collided.

During the time the Reigh Count was proceeding from Sambro Lightship toward the turning point, she had been sounding regulation fog signals on her whistle as well as sounding her convoy number in Morse Code. There is some evidence that her lookouts heard sound signals dead ahead, slightly off the port bow; and other sound signals indicated the presence of a vessel on the Reigh Count's port quarter, one on the starboard side abeam, and two on her starboard quarter. According to the Master's report on June 6th, all these

vessels were moving in close proximity to the Reigh Count's position about ten minutes before the collision. These signals indicated the proximity of other vessels in the convoy and that the ships of the convoy were not in a single line. But what their positions, distances and courses were, could not be determined from fog signals. The testimony of the Chagres with respect to fog signals heard by her was uniformly so specific with respect to the position and movement of vessels ahead and astern of her, especially near the turning point, that it is too good to be true.

■ All this testimony about sound signals in a fog must be considered having in mind its weakness, especially in the present case when so many vessels of an outbound convoy were surrounded by fog and were near a turning point. In United States v. Valldemosa Steamship Co., 2 Cir., 1947, 162 F.2d 759, 761 the Court observed:

"So far as the turn was made in reliance upon the bearing of the fog signal, it is enough entirely to discredit it that admiralty courts have over and over again refused to accept estimates based upon the direction of sound in a fog, after the classic discussion of Judge Brown in The Lepanto, D.C., 21 F. 651, 655–658."

This discussion by Judge Brown is set forth in Moore on Facts, § 273(1908). Sections 276 and 277 of Moore's work contain materials clearly illustrating the total unreliability of sound signals in a fog as a basis for locating the position and course of other vessels. See also The City of New York, D.C.S.D.N.Y.1883, 15 F. 624, 634. The fact that fog signals were sounding all around the Reigh Count and the Chagres, (there were 51 vessels in the convoy) adds to the uncertainty of this method of ascertaining position and course (The Colorado, 67 F.Cas. page 153, No. 3,028) as does the fact that the vessels sounding the signals and the Reigh Count and Chagres were moving at a speed of seven knots or better. The Alberta, D.C.E.D.Mich.1855, 23 F. 807, 810.

■ The Reigh Count was not at fault for following the vessel next in line ahead of her on taking her departure from Sambro Light Vessel. But the Reigh Count was at fault for failing to remain in the four cable channel once she had entered it on course 150°T, when her Master was aware that the course of the vessel ahead would take him outside the channel and would end by breaking into the second leg of the voyage (course 075°T) about one mile to the eastward of the designated turning point. It was a fault of her Master to continue to follow the vessel ahead when she was heading out of the channel.

The Reigh Count had maintained visual contact with the vessel next in line ahead through the medium of the latter's fog buoy, which was streamed about 250 feet astern throughout the course from Sambro Light Vessel towards the turning point, except for the last ten minutes. In following that vessel the Master was complying with the provision of the Routeing Instructions requiring adherence to the single line ahead formation. He may have assumed that the vessel ahead had another in sight in line ahead. And while he was thus proceeding on course 150°T toward the channel that assumption was reasonable. Once the Reigh Count had gained the channel, her Master should have recalled the importance of the channel as part of the Routeing Instructions and that the Convoy Commodore and the other vessels would be making the turn at 44° 07' 55" N, 63° 16' 20" W. This was the specific point at which the convoy was to alter course to 075°T, onto the ocean route, and at which, in clear weather, it was to form up. It was a critical point in respect to the maneuvers of the convoy. Deviation from this point would jeopardize the ships of the convoy turning at the turning point. In these circumstances it was error for the Reigh Count to persist in following the vessel ahead of her when she knew it would take her out of the channel and break through the line of ships which had completed their turn onto the ocean route.

The government contends that because of the presence of a southwesterly current the Reigh Count actually did not pass to the East of the easterly line of the four cable channel. Proof was offered that in the area between Sambro Light Vessel and a point 15½ miles south or southeast thereof, there is a southwesterly current with a drift of

.4 knot per hour and that this set and drift when applied to the Reigh Count's course of 150°T would place her within the four cable channel at the end of her passage on this leg, in the vicinity of the turning point, thus effecting an actual compliance with the Routeing Instructions. However, sets forth the maximum and average velocity and the prevailing direction of the wind for eleven days preceding June 15, 1943 as recorded by the anemograph at the Halifax Weather Office. The wind conditions for five days from June 1, 1943 to June 5, 1943 were as follows:

|  | Maximum Velocity | Average | Prevailing direction |
|---|---|---|---|
| "June 1/43 | West 15 | 9.0 | NW  N and W — |
| June 2/43 | Southeast 12 | 6.1 | South — |
| June 3/43 | Northwest 14 | 7.3 · | Northwest — |
| June 4/43 | North 12 | 8.9 | North — |
| June 5/43 | West 16 | 10.8 | Southwest — |

Captain Bordal did not consider the current in his navigation of the Reigh Count.

The Sailing directions for Nova Scotia, 1939 (H.O. 99 published by the U. S. Navy Hydrographic Office), p. 30, state:

"Southeast coast of Nova Scotia.—Along the southeast coast of Nova Scotia the offshore current generally sets to the southwest at an average velocity of about ¾ knot, but both direction and strength are much influenced by the wind. After a continuous westerly blow the current will run to the eastward at about ½ knot, and after a prevalence of easterly winds the usual southwesterly current is accelerated to more than 1 knot; in either case the set tends to be away from the shore."

In the Canadian Nova Scotia Southeast Coast and Bay of Fundy Pilot (1st Ed. 1940), at page 11 appears the following information:

"Admiralty chart 1651.

"Along the southeast Coast of Nova Scotia, the offshore current generally sets to the southwestward, at an average rate of about three-quarters of a knot, but both direction and strength are much influenced by the wind. After a continuous westerly blow the current sets eastward, with a rate of about half a knot; and after a prevalence of easterly winds, the usual southwesterly set is accelerated to more than one knot; in either case the set tends to be away from the shore."

A telegram from the Halifax Weather Office, dated January 11, 1947 (Ex. 124)

Clifford A. Barnes, Assistant Chief of the Division of Oceanography at the Hydrographic Office, Navy Department, analyzed this telegram as follows:

"The winds would have but very slight effect, from the data given in this telegram, would have a very slight effect upon the strength of the current or upon its direction. I might expound somewhat on that. When I say slight effect, it is an accepted average or ofttimes taken that the ratio of the—that a wind will be reflected in the current about 1½ per cent of the velocity of the wind. That is, if you have a ten-knot wind you will get a current of approximately 0.15 knot. That is based upon observations on the Atlantic Coast at a number of different lightships. So that would mean with the winds here, which, as a rough average, are approximately ten miles per hour, you could expect an effect on the current of that order of magnitude of 0.15 knot for a 10-mile an hour wind. The sailing directions give 0.75 where they say the current is about ¾ of a knot. So this would be about one-fifth of that value."

"Q. After deducting that percentage for the effect of the wind, would leave a net effect of the current of what? A. That would leave a net effect of the current of about .6 of a knot, and the wind happens to be almost in the opposite direction to the stated current, as stated in this reference, Ex. 111."

"Q. And that would give a net result as to the force of that tidal current as what, after deduction both for the wind and for

the tide? A. Accepting the original value and this tide being an ebb tide in that general area along the southeast coast, the tide floods in towards the Gulf of Mahone-west, or west along the southeast coast, and it ebbs in the opposite direction, that is, more out towards the open sea. So that the direction roughly of ebb would be somewhere between east and south. It would be a southeasterly direction and it would not to my estimation be more than .2 knot, and would leave a resultant current, correcting for both wind and tide, of approximately .4 to .5 of a knot in the original direction of southwesterly, which is stated in the Coast Pilot. They were sailing directions for Nova Scotia."

Charles Waterhouse, Superintendent of Pilots at Halifax, Nova Scotia, who as a British Master had navigated the waters in and about the position of Sambro Light Vessel entering and departing from Halifax Harbor, testified to the existence of a southwest set in that vicinity, as follows:

"Q. What, according to your experience, has been the force of that current alongside the coast of Nova Scotia, and with special reference to a distance of 15½ miles south southeasterly from Sambro Light Vessel? A. That is rather a hard question to answer right off, because the strength and direction of the current varies. It generally sets to the southwest, sometimes more than others, but if you had strong westerly winds for some time before there may be no current at all or it might even set slightly to the eastward.

"Q. What do you mean by strong westerly winds for some time before? A. If it has been blowing for two or three days before from the west or southwest, force 5 or 6 on the Beaufort scale we will say, that will tend to retard the speed of the current.

"Q. A continuous wind for that time? A. I would not say a continuous wind, but if there had been a good deal of westerly wind for some days it tends to slow the speed of the current."

"Q. Assuming the wind conditions to have been as shown in Exhibit 124, and based upon your experience with such wind conditions prevailing, what in your opinion would have been the current set on the 5th of June, 1943, along the southeasterly coast of Nova Scotia? A. I would think it was set about half a knot.

"Q. And which way? A. Southwest, that is, in the vicinity of Sambro Light-ship."

Captain Reginald Kean, Master of a vessel running between New York, Nova Scotia and New Foundland who had navigated the waters of the four cable channel, as it had been established during the war and after June 5, 1943, testified that he had encountered a southwesterly set in these waters.

Two witnesses for the Chagres, Captains DuPont and Stephens, who had had extensive seagoing experience on various types of vessels and who were serving on combat vessels, such as destroyers, frigates and corvettes, during the war, testified that they navigated the area between Sambro Light Vessel and the turning point many times as escorts for outbound convoys and that they had never made allowance for the current nor had they experienced it on these trips. Captain DuPont had sailed to and from the harbor of Halifax in large passenger ships before the war and he had not experienced the southwesterly current on these voyages.

The effect of such a current would obviously be to set both ships, the Chagres and the Reigh Count, in the direction of 225°T. In the case of the Chagres, it would only serve to put her further to the westward of the four cable channel. In the case of the Reigh Count the fortuitous circumstance of the existence of the current, operating over a two hour period, would set her in the direction of 225°T a distance of .8 of a mile, which would place the Reigh Count almost within the westerly limits of the four cable channel in the vicinity of the turning point.

In view of the variations in the strength and direction of this current as stated in the Sailing Directions and the Canadian Pilot publication and giving due weight to the testimony of Captains DuPont and Stephens it has not been shown with sufficient certainty that this current, setting in the direction of 225°T with a drift of about

.4 of a knot, was actually operating between 2:00 P.M. and 4:30 P.M., in the area between Sambro Light Vessel and 15½ miles southeast thereof on June 5, 1943, so as to set the Reigh Count within the easterly boundary of the four cable channel just prior to the collision.

Another fact which shows that whatever current there was did not serve to set the Reigh Count into the channel, is that there were so many vessels to the starboard of the Reigh Count near the turning point as she was proceeding on course 150°T.

There remain for consideration the movements of the Reigh Count and the Chagres after the vessels sighted each other. At 4:20 P.M. the Master of the Chagres, and others on watch on the Chagres, sighted the Reigh Count at a distance of between 400 and 600 feet. The testimony of Captain Pederson, Master of the Chagres was that his first knowledge of the Reigh Count was when he saw a ship's plating off the port bow distant about 400 feet. A few seconds later he discerned her mast and funnel and observed that she was proceeding on a course of approximately 155°T, at right angles to his course, 075°T and was going quite fast, at least seven knots. Arthur McNamara, wheelsman on the Chagres, testified that from his position in the wheelhouse (his view was restricted to about two points on either bow) he saw the bridge or funnel of the Reigh Count bearing two points off the Chagres port bow, distant a little over a ship's length. Ralph McCallum, a lookout stationed on the forecastle of the Chagres, testified that he observed the Reigh Count a moment before he heard the three blast backing signal of the Chagres, and that the Reigh Count's superstructure bore about 3 or 4 points on the port bow of the Chagres, distant about a ship's length.

William Chiodi, a naval seaman first class, on watch on the Reigh Count as a lookout on the after gun deck, located on the fantail of the vessel and elevated about ten feet above the main deck, was the first one on the Reigh Count to sight the Chagres. A diagram prepared by him, illustrating the respective positions of the vessels at the time of sighting, shows that the Chagres was approaching the Reigh Count at right angles and was positioned about 2 points forward of the starboard beam of the Reigh Count. Antoine Duprez, Chief Officer of the Reigh Count testified that he observed the Chagres, after it had been reported by Chiodi, bearing "about six or seven points from the bow at an angle of 90 degrees coming straight at us." This observation would place the Chagres in about the same position as that fixed by Chiodi, about 2 points forward of the starboard beam. Captain Bordal, Master of the Reigh Count testified that when he observed the Chagres she bore about five or six points on the starboard bow distant about one and a half ship lengths. A diagram prepared on the taking of his deposition indicates that the Chagres was probably observed by him about broad on the Reigh Count's bow.

While all this evidence as to position at the time of sighting is not completely reconcilable, it does appear that when the Chagres and the Reigh Count were within 400 feet or a ship's length of each other their positions were such that the Chagres was at least broad on the Reigh Count's bow or 3 points forward of the starboard beam and had the Reigh Count's stem almost dead ahead. In this position, observing the Reigh Count to be on a course which would cross his bow and "going quite fast", at least 7 knots (700 feet per minute) and aware that he was making 7 knots himself, thus fixing the relative movements of the vessels toward each other at slightly more than 7 knots, the angle of approach being 80°, the Master of the Chagres gave the order of full astern to the engine room and hard astarboard to the wheel, at the same time sounding three blasts on his whistle. He did not blow any signal to indicate a change in his heading to starboard. The Chagres orders were given without any movement to port or starboard on the part of the Reigh Count, although the Master of the Chagres testified that as the Reigh Count came on she seemed "to start to go to port." The distance between the vessels at the time the helm and engine orders were given was about 400 feet. The Chagres, even with her engines in reverse, would continue to advance some

distance toward the Reigh Count, before the right rudder would begin to take effect and the Reigh Count, regardless of what action was taken by her, would be moving across the Chagres' bow from port to starboard. A turn to starboard by the Chagres under those circumstances was a turn into danger—into the collision. Cuba Distilling Co. v. Grace Line, Inc., 2 Cir., 1941, 143 F. 2d 499.

■ The Master of the Reigh Count was on the port wing of the bridge, on the side opposite that from which the Chagres was approaching, when the Chagres was reported. He leaned over the forward rail of the port wing to sight the Chagres and then went through the pilot house to the starboard wing to observe the Chagres. This slight delay cannot be deemed an error or fault, on the part of the Reigh Count's Master, as herein above stated. The Vernon City, 70 L.L.Rep. 270, 291 (1941).

In The Tongairo, 79 L.L. Rep. 22, 25 (1945), the Court observed that a master is entitled to have time to estimate certain important factors such as: "the heading of the other ship, the speed of the other ship, the distance of the other ship, the power of manoeuvre of the other ship and the question of whether she is in fact manoeuvring either by helm action or by engine action. All those are unknown factors which he has to take into account when deciding what is the proper step for him to take himself."

A moment later Captain Bordal ordered the engines ahead at full speed, sounded one blast on the whistle and ordered the wheel put hard right. At this time the vessels were in approximately the same position as when the Chagres made her maneuver to starboard. Since the Reigh Count was moving across the bow of the Chagres at this time and the ships were only 400 feet distant, the proper maneuver in these circumstances for the Reigh Count was to continue across the Chagres bow at an increased speed. And since the vessels would continue to close on each other the danger lay in not getting the Reigh Count's stern across the Chagres' bow. To meet that situation a hard right rudder was the correct maneuver. The

British Resource, 68 L.L.Rep. 5, 8 (1940) aff'd. 70 L.L.Rep. 93(1941).

At the time the vessels sighted each other in a dense fog there was only 400 feet separating them. The danger of collision was indeed imminent, but the position of the vessels and their speeds did not present a condition where the collision was inevitable. The relative speed of the vessels indicates that in a half minute's time the Reigh Count, which was almost dead ahead of the Chagres, would have traveled more than a ship's length (400 feet), and certainly so under a condition of getting up full speed ahead, while the Chagres in the same half minute period would have traveled no more than 350 feet, and perhaps less if her full astern condition is considered. If the Chagres had turned to port when she reversed her engines the collision could have been avoided. The Chagres' turn to starboard prevented the Reigh Count from crossing her bow and brought the stem of the Chagres into collision with the after part of the Reigh Count in the vicinity of number 5 hatch, only 60 feet forward of the Reigh Count's stern.

■ The Chagres argues that "the situation from the instant that the vessels first saw each other was such an emergency that any avoiding action, taken promptly, could not be criticized because the error, if any, was an error in judgment in extremis." The Chagres had violated the convoy routeing instructions in following the course 155°T for almost 12 miles after she had lost sight of the fog buoy of the vessel ahead; in proceeding at a speed of 7 instead of 7½ knots; and in continuing on for about a mile beyond the turning point. All that helped put the Chagres at the point she was when she sighted the Reigh Count. The doctrine of in extremis does not operate upon acts done by a master suddenly and abruptly faced with peril or the danger of collision, where his prior fault contributed to the risk or danger of collision. The City of New York, 1893, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Albert Dumois, 1900, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751; The Manchioneal, 2 Cir., 1917, 243 F. 801, 804; The Lexington, 2 Cir., 1921, 275 F. 279.

Here both the Chagres and the Reigh Count were at fault for failing to follow the proper course and the faults of both put them in the position they found themselves in, faced with the imminent peril of collision. In the Manchioneal, 2 Cir., 1917, 243 F. 801, 804, Judge Hough said:

"But if, as we find and hold, the vessels did not see each other until they were about 500 feet apart, we consider them both at fault for having permitted such a situation to arise. Down to that time it may be admitted that each master thought himself proceeding at moderate speed in a fog; but, when they were in sight of each other, the Manchioneal hard aported, the New Jersey hard astarboarded, and both rang for full speed ahead; and now each avers that, if this action was error, it was error in extremis. But that phrase always implies that the false maneuver must be produced solely by the fault of the other vessel (The Elizabeth Jones, 112 U.S. 514, 5 S.Ct. 468, 28 L.Ed. 812); and when each of the colliding craft does in the very jaws of collision, what each tries to excuse by pleading in extremis, both are necessarily in fault for unnecessarily getting into a position which produced false maneuvers in both."

The Chagres cannot exculpate herself since she was guilty of prior faults which contributed to the collision. The situation which confronted her was not due solely to the fault of the Reigh Count.

In Cuba Distilling Co., Inc., v. Grace Line, Inc., 2 Cir., 1941, 143 F.2d 499, the language used is peculiarly pertinent to the circumstances in the instant case, on the issue of error in extremis. The Court said:

"Whatever measure of lenity we should accord the 'Lara' faced with the sudden apparition of the 'Cassimir,' we cannot excuse her altogether. The judge found that, when the 'Cassimir's' lights were snapped on, she already appeared to be a vessel headed across the 'Lara's' bows from port to starboard * * *.

"It made the 'Lara's' navigation the only course sure to bring her into collision. Had she kept on, she would probably have gone under the 'Cassimir's' stern; had she backed, she would almost certainly have done so; had she put her rudder hard left, that result would have become still more assured. It is indeed the instinctive response of a master in an emergency to put his rudder hard right; if both ships do so, the chances of collision are apt to be much reduced. But no emergency will excuse the absence of all clear thinking; after all, men, charged with responsibilities of command, must not be wholly incapacitated for sound judgment when suddenly thrust into peril. Part of their equipment for their duties is some ability to think, be the situation ever so sudden and so grave. * * * The situation falls within what we said in A. H. Bull S. S. Company v. United States, 2 Cir., 34 F.2d 614, 616; 'Even in extremis * * * some discretion is demanded; the phrase means no more than that less judgment is required in an emergency than when there is time to consider; it does not exculpate all faults; it is no more than a palliative.' "

This same view was stated in The Lima, 69 L.L.Rep. 111, 117 (1941). The Court, in analyzing the position of a Master put suddenly in a position of danger and forced to select a course of action, said:

"But as matters turned out he had at least three roads to safety, yet none of them was so apparent that in my judgment he ought to be blamed because he failed to take that particular individual road.

"Instead of taking any of them however, he unfortunately elected, in defiance of every rule of good seamanship, to take the one course which was most likely to contribute to the collision."

The Court further stated that even though the vessels may be excused for failure to do the best thing under the difficult circumstances that were present, and even though one vessel was put in a position of surprise, the action of selecting the one course bound to bring about a collision was a failure in seamanship.

The maneuver selected by the Chagres was the most likely path to collision, regardless of what maneuver the Reigh Count would execute. The fault of the Chagres is emphasized by the fact that the maneuver executed by the Reigh Count was the only one open to her in her bolt for

safety. In such circumstances the doctrine of error in extremis would not operate to relieve the Chagres from fault, for failure to do that which by knowledge and experience should have been done, once the Reigh Count was observed crossing the bow of the Chagres.

The Reigh Count contends that the Chagres was guilty of another and final fault in failing to stand by the Reigh Count after the collision, and in continuing on her course. Title 33 U.S.C.A. § 367 provides:

"§ 367. Duty of master of vessel in collision to give aid, name of his vessel, etc. In every case of collision between two vessels it shall be the duty of the master or person in charge of each vessel, if and so far as he can do so without serious danger to his own vessel, crew, and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance, and to render to the other vessel, her master, crew, and passengers (if any) such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision, and also to give to the master or person in charge of the other vessel the name of his own vessel and her port of registry, or the port or place to which she belongs, and also the name of the ports and places from which and to which she is bound. If he fails so to do, and no reasonable cause for such failure is shown, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect, or default. (Sept. 4, 1890, c. 875, § 1, 26 Stat. 425.)"

When the Chagres struck the Reigh Count the blow was apparently not a heavy one according to the witnesses for the Chagres. The witnesses for the Reigh Count testified that the vessel did not heel over very much, perhaps 15°, no one was thrown off his feet. From the reports received by the Master of the Chagres from the lookout who saw the point of impact on the Reigh Count and from the initial estimate of his own damage, he said he believed that the Reigh Count's plating had not been pierced. That does not appear well founded, knowing as we do what actually happened to the Reigh Count. The Master of the Chagres ordered his radio operator to be alert for distress signals from the Reigh Count. The Reigh Count's radio had been rendered inoperative by the collision and no distress signals were sent by her which the Chagres could have received. He heard some whistle blasts from the Reigh Count which were apparently meaningless (it appears that she did not send a distress signal by sounding her whistle) and so he proceeded at slow speed for about 10 minutes in the general direction in which the Reigh Count had disappeared. After ten minutes had elapsed the Chagres proceeded on its convoy course and upon meeting up with an escort vessel that night notified it, and the next day the Convoy Commodore, of the collision and the approximate position of its occurrence.

Both the Chagres and the Reigh Count were part of a large convoy bound for Europe during wartime. They were maneuvering in a dense fog not far from the turning point in their course. They were subject to convoy regulations. Escort vessels were accompanying the convoy. Under the circumstances no inference or presumption of fault can be charged against the Chagres, within the provisions of the standby statute. The factors outlined above establish reasonable cause for any failure to remain in the vicinity for a period longer than the ten minutes the Chagres claims she was so engaged.

The testimony adduced upon the trial and upon the taking of the many depositions is not completely reconcilable and raises pointed issues of credibility which require careful analysis and consideration. There is conflict in the testimony of Captain Bordal and Third Officer Lyse of the Reigh Count on the question of when the course of 150° was set or laid off on the chart, Lyse asserting that it was laid off before sailing while Captain Bordal claims it was determined upon reaching Sambro Light Vessel. I am satisfied that this course was not set by Captain Bordal, until he passed Sambro Light Vessel and set out astern of the Jean (No. 123). There were no papers from which these officers could refresh their recollections and their testimony was taken two years after the occurrence during

which time they had sailed on other vessels in various parts of the world. Captain Bordal was primarily responsible for the navigation of the vessel, it was his duty to determine the courses, and it was he who was navigating the vessel at the time. This concern would naturally fix in his mind the manner in which the course was set to a greater degree than that of Third Officer Lyse.

There is some confusion in the testimony as to whether Chief Officer Duprez relieved Third Officer Lyse or not. This is perhaps immaterial except for what light it would throw on the management of the Reigh Count at the time. It is apparent that Lyse continued to stand his watch after 4:00 P.M. until the time of the collision. Duprez had just been assigned to the ship and was unfamiliar with the vessel and the crew and he had never sailed in convoy before, whereas Lyse had made at least one trip in convoy, he was familiar with the vessel and crew, and Captain Bordal knew his ability. Under these circumstances it was desirable that he remain on the bridge and Captain Bordal testified that he requested Lyse to stand by although he did not say anything about relieving the watch. Lyse's continued presence was at Bordal's request, and did not of itself prove that the watch was not relieved. The evidence conclusively establishes that the three officers were on the bridge, Bordal and Duprez on the port wing and Lyse on the starboard wing. Whether Duprez formally relieved Lyse had no bearing on the fact of the collision and is not material.

Other points of alleged contradiction are raised by the Chagres, one as to who operated the engine order telegraph of the Reigh Count and sounded the one blast signal at the time of the turn to starboard after sighting the Chagres. It appears that this was done. Who did it is not material in determining fault in this case. It was a moment of emergency and a rapid sequence of events, into which this act fitted, but how and by whom could naturally be the subject of faulty and conflicting recollections a few years after its occurrence.

Another issue is raised as to the presence of Captain Bordal in his cabin at 3:30 P.M. on June 5, 1943, with Chief Officer Duprez.

The testimony of Captain Bordal on this issue is to the effect that he may have gone down to his cabin for a moment but that he does not remember the incident. Duprez, on the other hand testified that he did confer with the Captain in the latter's cabin at 3:30 P.M. The fact that the Captain left the bridge to confer with a newly appointed chief officer does not prove anything. Lyse, the watch officer, was on the bridge; it was not imperative that the Master remain there without leaving the bridge, even for a short interval. This incident, like the others, is not material and has no relevancy whatsoever to the issue of faulty navigation.

Discrepancies in the testimony of the witnesses to the events leading up to the collision have occurred in minor details, which do not appear to be material and do not require discussion. Such a state of the evidence, taken on deposition at different times, is not unusual in admiralty. A complete uniformity in the observations of those present, despite the passage of time, would give rise to the suspicion created by a too pat repetition of excusatory matter.

The issue of seaworthiness of the vessels does not appear to have survived the trial. With respect to the Chagres, the government's brief does not argue the question of her seaworthiness and it is clear that she was seaworthy in all respects. Indeed, her evidence in this respect is undisputed. Considerable testimony was adduced upon the trial on behalf of the government with respect to the seaworthiness of the Reigh Count. On page 40 of his brief, counsel for the Chagres states:

"The Chagres has never contended that the collision itself was due to any unseaworthiness on the part of the Reigh Count. * * *

"The contradictory statements by the watch engineer and Chief Engineer of the Reigh Count during their examination unwittingly furnished evidence to indicate that the Reigh Count did in fact sink on account of the unseaworthy condition of her equiptment * * *.

"If the Court now feels that the Government's testimony establishes seaworthiness, and that the sinking of the Reigh Count

was a direct result of the collision, we make no argument to the contrary."

The testimony as to the seaworthiness of the Reigh Count shows that due diligence had been exercised to make the vessel seaworthy, and that she was in fact seaworthy. After having been requisitioned by the United States in 1941, her machinery having been sabotaged, she was conditioned and repaired at a cost of $478,049.85 and was classified by the American Bureau of Shipping on December 22, 1941, as "A—1, A. M. S." In 1942 and 1943 surveys under the American Bureau of Shipping were conducted and she was certified to be in a seaworthy condition. Before leaving New York for Boston and Halifax in May 1943, the Reigh Count was loaded and stowed in a proper manner; and she was properly trimmed, although she had a drag of 4½ feet by the stern. The testimony of Watson, who conducted a survey for the American Bureau of Shipping, and of Walls and Bagger, resolve any doubt that might have existed concerning the seaworthiness of the Reigh Count, as to the shaft alley and the watertight door and the fact that it was not closed at the time of or after the collision. I have concluded that the Reigh Count was seaworthy upon her departure from Halifax. The fact that the watertight door in the shaft alley was not closed, did not cause or contribute to the sinking of the Reigh Count. She was doomed when the concrete filled bow of the Chagres opened a rent in her side two feet wide, which extended well below the water line. She sank in about twenty minutes.

I have concluded that the collision between the Reigh Count and the Chagres was due to fault and negligence on the part of both vessels as hereinabove discussed. Both vessels were seaworthy. The collision resulted from faulty navigation. The owners of the vessels are entitled to the statutory limitation of liability and their petitions therefore are granted. The damages are to be divided.

Findings of fact and conclusions of law are being filed together with this opinion. An appropriate decree should be settled on five days' notice.