## QUEEN INS. CO. OF AMERICA v. GLOBE & RUTGERS FIRE INS. CO. *

(Circuit Court of Appeals, Second Circuit. May 29, 1922.)

No. 317

1. **Insurance ☞413—Warlike operations must have proximately caused loss, to impose liability under war risk clause marine policy.**

In order to impose liability under the war risk clause of a marine insurance policy, "all forms of hostilities or warlike operations of whatever kind" must consist of some form or kind of hostility or warlike operations which have proximately caused the loss, and remote consequences of hostilities cannot become a recoverable loss, even if they may be said to be proximately caused by something itself ascribable as a consequence of hostilities.

2. **Insurance ☞403—Loss by collision at sea prima facie a marine peril.**

Loss by a collision at sea is prima facie considered a marine peril.

3. **Insurance ☞406—"Warlike operations" and "hostilities" defined.**

The word "hostilities," as used in the war risk clause of a marine insurance policy, is intended to describe an actual operation, offensive or defensive, in the conduct of war; and the phrase "warlike operations" refers to operations in time of war. The peril must be due directly to some hostile action to be a warlike risk; and if the peril be a maritime risk, and is but aggravated or increased by the operation relied on as a warlike operation, then the risk is not a war risk.

4. **Insurance ☞406—Sailing convoy without lights during war period held neither "warlike operation" nor consequence of one.**

Where vessels sailing in convoy collided, but were engaged in no warlike act, and those who issued orders to their navigators did not consider their orders to be warlike, even though performed in a war period, the fact that they were sailing at night without lights to avoid the submarine peril during a war period did not constitute a warlike operation, nor the consequence of one, under war risk clause of a marine insurance policy; nor was it a warlike operation because the vessels were sailing in convoy.

5. **Insurance ☞406—Nature of operation, and not character of cargo, determines question of warlike operation.**

The nature of the operation of a vessel and not the character of its cargo, as whether the cargo is intended for warlike use, is the material thing to be considered in determining the question of its warlike operation, under the war risk clause of a policy of marine insurance.

6. **Insurance ☞665(4)—Evidence held to sustain finding that collision was due to faulty navigation and not to warlike operation.**

Evidence in actions on marine policies *held* to sustain finding that a collision between vessels sailing in convoy was due to faulty navigation, and not to warlike operation.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the Queen Insurance Company of America against the Globe & Rutgers Fire Insurance Company. From a decree dismissing the libel (278 Fed. 770), libelant appeals. Affirmed.

Libelant brought this suit for the loss of a cargo shipped on the Italian steamship Napoli. She was one of a convoy of vessels proceeding from Gibraltar to Genoa. She collided with the steamship Lamington, one of another convoy of vessels proceeding from Genoa to Gibraltar. There were policies of insurance, one for maritime and one for war risk, issued on this cargo. Appellant issued and delivered the marine policy, and the appellee issued and delivered the war risk policy. When the loss took place, the underwriters, by

☞For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

*Certiorari granted 258 U. S. ——, 43 Sup. Ct. 95, 67 L. Ed. ——.

agreement and without prejudice to the rights which each might have, paid the insured one-half of the amount to which he was entitled. The appellant, because of its payment and by assignment, succeeded to the rights of the cargo owner, and brought this suit against the war risk underwriter, and seeks to recover the amount not already paid by the appellee. The Napoli was an Italian steamer of 5,709 tons burden, and on June 30, 1918, was bound from New York to Genoa, having left Gibraltar in a convoy of about 20 vessels. This convoy was arranged in three tiers. The Napoli was the middle ship of the second tier. The distance between the ships, fore and aft, or on either beam, is not stated. This convoy was protected by six small vessels of the British, Italian, and American Navies. The navigation of the convoy was intrusted to a commodore of the Italian Navy, who was aboard the Napoli; but he was subject to the command of a captain of the British Navy as the senior naval officer present. Before leaving Gibraltar, the vessels were routed through designated positions until they reached 42° 58′ N. and 5° 50′ E., the Genoa rendezvous, from which position they were to proceed from Genoa after instructions received there. Because of favorable weather, it appears that this convoy was 24 hours ahead of its schedule on July 4, 1918, at 8 p. m.

On the morning of that day, a convoy of 17 vessels, in three tiers, left Genoa for Gibraltar. The commander ship was the fourth vessel of the first tier of 8 vessels and was followed by a second tier of which the Lamington, a British vessel, was on her port side. The distance between the columns is given as 800 yards while zigzagging and 600 yards when not. The ships in the columns were about 400 yards apart. This convoy was commanded by the rear-admiral of the Italian Navy. His authority extended over the 5 escorting naval vessels, which vessels were operating on the flanks and astern, as did the escorting vessels of the east-bound convoy. The courses taken by these vessels were according to the signal of the commander in charge. This convoy proceeded until about 7 p. m. on July 4, when one of the cargo vessels was torpedoed. The fleet immediately began to zigzag, but the base course was not changed until about 8:30 p. m., when it was set at 247° true in accordance with the directions given for the attack. Later, at 10:30 p. m., the course was changed to 261° true, and this was maintained until the convoys met.

There appears to be no national or international authority which required the vessels to sail in convoy, but this custom at the time was universally followed. The instructions given to the vessels in convoy and through the officer in charge came from the shore or station thereto at either end of the Gibraltar-Genoa line. The senior naval officer in charge enforced these general orders, except he exercised his own judgment in departing from them in such details as he deemed necessary. The convoys met midway between northeastern Corsica and France, while in a passage about 100 miles wide. At the time their position was 43° N., 7° 58′ E. The east-bound convoy was N. E. true, and the west-bound convoy was 261° or W. ¾ S. There were about 35 vessels with accompanying escorts, and were thus divided into two fleets with convoys going about the same speed, 7.3 knots per hour. Each leading tier picked up the loom of the vessels at a distance of about three-fourths of a mile. Each thought the other was on an opposite course. They immediately turned on their navigating lights. Most of the vessels slowed to steerageway, and held their courses as closely as possible, and passed down through the lanes between the fore and aft columns of ships, and thus avoided the collision. The Napoli, porting, did not straighten up on her course, but stopped directly in the path of the Lamington, which was traveling some 800 yards on the port quarter of the commander's ship, the Ansoldo. The Lamington proceeded at a speed of about 6 knots until she saw the Napoli or her lights too close to avoid collision. The Lamington struck the Napoli on the port side almost at right angles, sinking her.

The evidence adduced on the trial consisted of the log and statements from members of the escorting vessels who were in the United States Navy. It is explained that the parties were unable to secure information from the authorities of the British and Italian Admiralties. The record does contain a transcript of sailing orders, a war diary, a log, and a communication record of the United States ship Castine, and similar records of the United States ship Yankton; also documents, relating to the Italian Court of Inquiry, show-

ing the report of the sea voyage before the Genoa Civil Tribunal by the master and certain members of the crew of the Napoli, and the findings of the Commission of Inquiry of the Italian Ministry of Marine, and a letter from the Royal Italian Embassy under date of June 2, 1920, which denied information because of the confidential nature of the report to the proctors for the libelant. Other documents in the record are letters from the Secretary of the British Admiralty, denying information sought from it by the proctors, and depositions of the master and second officer of the Napoli; depositions of the captains of the United States ships form part of the record, as does a memorandum of facts by an ensign of the Yankton. It appears by the affidavit of Charles Hann, Jr., that the cargo on the Napoli consisted of a varied commercial cargo, and was intended for use by the Italian government in the prosecution of the war. The list contains what might be considered munitions of war, namely, certain "tubes for Italian 80-foot subchasers and artillery case heading press." It was all contraband, but none of it could be considered, as it was in the cargo, fitted for warlike operations.

The marine policy issued by the appellant contained the following f. c. and s. clause: "Warranted by the assured free from loss of expense arising from capture, seizure, restraint, detention, or destruction, and the consequences thereof, or of any attempt thereat, and also from all consequences of riots, insurrections, hostilities, or warlike operations, whether before or after declaration of war, and whether lawful or unlawful, and whether by the act of any belligerent nations, or by governments of seceding or revolting states, or by unauthorized or lawless persons therein, or otherwise."

Appellee's war risk policy contained this clause: "It is agreed that this insurance covers only the risk of capture, seizure, or destruction, or damage, by men-of-war, by letters of marque, by takings at sea, arrests, restraints, detainments, and acts of kings, princes, and people authorized by and in prosecution of hostilities between belligerent nations."

Harrington, Bigham & Englar, of New York City (D. Roger Englar and O. R. Houston, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham, Van Vechten Veeder, and Ralph W. Brown, all of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge (after stating the facts as above). The District Judge examined into the cause of collision, and, from the testimony offered, incomplete as it is, concluded that the collision was due to faulty navigation. It was determined that the loss was not covered by the war risk policy, but was covered by the marine policy, and the libel was accordingly dismissed. The provisions of the war risk policy assume all the consequences of hostilities or warlike operations, while the f. c. and s. clause of the marine policy excludes all consequences of hostilities or warlike operations. The appellee's war risk policy covers "acts of kings, princes, and people authorized by and in prosecution of hostilities between belligerent nations."

[1] In order to impose liability under the war risk clause policy, "all forms of hostilities or warlike operations of whatever kind" must consist of some form or kind of hostility or warlike operations which have proximately caused the loss. Remote consequences of hostilities cannot become a recoverable loss, even if they may be said to be proximately caused by something itself ascribable as a consequence of hostilities. British Steamship v. The King, [1921] 1 A. C. 99, 107, 131.

[2, 3] The phrase "all consequences" has been held by the British

courts as meaning "proximate consequences only." Ionides v. Universal Marine Ins. Co., 14 C. B. (N. S.) 259 (1863); Anderson v. Martin, [1908] A. C. 334, 339. The loss was by a collision at sea, and this prima facie is considered a marine peril. To establish a loss which falls upon the war risk underwriter, the burden must be borne by him who attempts it, and in this case the appellant. Therefore the question is presented: What is mean by the phrase "hostilities and warlike operations," as used in the war risk policy? There is little of aid in the authorities established by the courts of this country. The question has been considered by the British courts in a considerable number of cases. There the authorities may be summarized as holding that "hostilities" is intended to describe an actual operation, offensive or defensive, in the conduct of war, and "warlike operations" as operations in time of war. The peril must be due directly to some hostile action, if it be considered a warlike risk. If the peril be a maritime risk, and is but aggravated or increased by the operation relied upon as a warlike operation, then the risk is not a war risk. British S. S. v. The King, [1921] A. C. 99, 133. There it was said:

"If the operation relied upon as a warlike operation is one which creates no new risk, but only aggravates -or increases an existing maritime risk, by removing something which, but for the war, would have been a safeguard against the risk, then the risk is not a war risk. But, if the peril be directly due to hostile action, it is a war risk."

[4] When one vessel of one of the convoys was attacked by a submarine, the course of the convoy was altered four points to the right; but before the convoys met, and this collision ensued, it was again altered four points to the left. This latter change must be deemed to have neutralized the former. The trial judge, who exhaustively examined the navigation of the vessels, concluded that the torpedoing of the vessel in the west-bound convoy was 5 hours before the meeting of the east-bound fleet, and did not affect the question of the collision or its cause. It did slow up the convoy making progress towards its point of destination. It was about 30 nautical miles from the scene of the torpedoing of the Merida to the point of collision, and about 5 hours were consumed in making that distance. It is explained that there was zigzagging of the vessels in making at least part of this distance. We conclude that this attack, occurring, as it did, some 5 hours previous to the time of the collision, has no bearing upon the cause of the collision.

The appellant's contention is that this engagement was a warlike operation, because (first) the vessels were sailing without lights; (second) that they were proceeding in convoy; and (third) that the Napoli carried a cargo intended for warlike use. Where vessels proceeded at sea during this war period, it was the custom to sail without lights. These vessels were all operated without lights. The voyages upon which each of the vessels were engaged would, if in time of peace, be treated as an ordinary maritime adventure. It would not become a warlike operation, within the intention of the terms of the policy, because of the fact that, as a precaution against possible attack or capture, the masters of the vessels did not show lights during the night,

and even though the consequences of such action meant the concealment of the vessels and their liability to collide. It may be imprudent navigation to take this risk, or it may be blameworthy from other points of view; but, if it is done in obedience to lawful commands, it cannot be considered a warlike operation. The object, of course, is to avoid an ememy's attack; but no enemy was present at the time of the collision. The purposes of the adventures of the ships were peaceable. Neither vessel was doing a warlike act, and those who issued the order to the navigators of the vessels did not consider their orders to be warlike, even though performed in a war period. In a word, nothing of actual hostilities was present at the time of the collision.

Therefore we conclude that sailing without lights was neither a warlike operation nor was it the consequence of one. The reason for sailing without lights was due to the submarine peril, but the collision was due to faulty navigation, which cannot be said to be the proximate consequence of the failure to have lights. It appears that the lights were turned on just before the collision as the convoys met. The authorities of the House of Lords of England are fully in accord in pronouncing that sailing without lights does not constitute a warlike operation. The Petersham Case, Britain S. S. Co. v. The King, [1921] 1 A. C. 99. In the Ionides Case, 14 C. B. (N. S.) 259, a cargo was placed on board the ship Linwood, insured by a policy warranted free from all consequences of hostilities. On her way from New Orleans to New York in 1861, her master, supposing that he had passed Cape Hatteras, instead of keeping his course N. N. E., changed it to W., and went ashore about 10 miles south of the Cape. Until the outbreak of the Civil War, a light had always been maintained at Cape Hatteras; but it had been extinguished by the Confederate authorities for hostile purposes. The court of first instance in England held the proximate cause of the loss was the peril of the sea and that the underwriter was therefore liable. This decision was by the Court of Common Pleas. It later met with approval in the Petersham Case, supra, and was approved by Mr. Justice Brown, when a District Judge, in Richelieu & Ohio Navigation Co. v. Boston Marine Ins. Co. (C. C.) 26 Fed. 605, and later in The Titania (D. C.) 19 Fed. 104, by Judge Addison Brown. It involved the application of the doctrine of proximate cause. There, there was hostile action in the matter of the extinguishing of the lights by the Confederate troops, and there was a maritime casualty due to stranding, both of which had bearing upon the liability under the marine policy which warranted "free from all consequences of hostilities," and the question whether the proximate cause of the loss was a marine peril or hostilities was presented. It always becomes necessary to distinguish between causes and conditions as well as proximate and remote causation. The distinction must always be maintained between warlike operations and acts done in the course of a war.

The maxim, "causa proxima non remota spectatur," as a guide in this determination, compels the conclusion that the absence of light does not justify the claim of the appellant that that of itself consti-

tutes a warlike operation. Nor was it a warlike operation because the vessels were sailing in convoy. The vessels were not required to sail in convoy. It was optional with each master to become a member of the convoy. It proved to be the custom of the war period. If a vessel joined a convoy, it was required to conform to the instructions as to courses and management given by competent naval authorities. It perhaps meant an increase of the maritime risk of collision. It was sailing in company with other vessels for the sake of protection in case of danger of attack; but each vessel was still on a peaceful adventure. It was the duty of the naval officers and the escorting vessels to diligently perform their duties of convoying and protecting the ships, and to defend the ships in case of attack, and not to burden them or expose them to hazard.

But at the time of the collision none of these things which it was the duty of the escorting vessels or naval officers to perform took place. There was no requirement at that time for their services. It was no command of the naval officer which brought about the collision. It has been held by a divided court in England that sailing in convoy is not a warlike operation. British India Steam Navigation Co. v. Green, [1919] 1 K. B. 632; [1919] 2 K. B. 670; [1921] 1 A. C. 99. In the House of Lords, the majority of the Lords declined to hold that the vessels convoyed become identified with the ships of war protecting them. The east and west bound convoys were each navigating for itself. The course of the convoys might cross in any event, and it was obviously impossible for the allied naval authorities to have laid out their courses so that they would not meet. Each sailed in complete ignorance of the other's sailing, from all that the record shows, and we find nothing concerning the convoys' courses which might be said to constitute a warlike operation.

[5] Nor can it be said that the character of the cargo made the adventure a warlike operation. The nature of the operation, and not the character of the cargo or the persons in charge, has been held to be the material thing to be considered in England. Owners of S. S. Marchtrove v. The King, 36 Times L. R. 108. There a vessel chartered to the United States Navy, carrying munitions for the American Army in France, was held to be only a cargo ship, and in Harrison, Ltd., v. Shipping Comptroller, [1921] 1 K. B. 122, the vessel stranded on her way from Salonika to Tranto, having on board hospital stores for the British government and carrying a few British troops, and it was held that she was not engaged in a warlike operation, since her aim was to get as peacefully and expeditiously as she could to her harbor of destination. The war risk would be the same, no matter what the character of the cargo, as would the marine risk. "The dominant feature of the ship and the dominant object of the voyage must be looked at." Harrison, Ltd., v. Shipping Comptroller, supra.

[6] The District Court held that both the navigators of the Napoli and the Lamington "failed in their ship management to exercise the ordinary care and skill of their calling," and concluded that the proximate cause of the collision must therefore fall upon the marine underwriters. An examination of such testimony as has been offered

leads us to agree with this conclusion. Mr. Justice Hill, who considered the case in the British courts in a suit by the owners of the cargo on the Napoli against the owner of the Lamington (the opinion is part of the record), found no fault on the part of the Lamington, but said that "the immediate cause of the collision was the porting of the Napoli and nothing else." Both judges have concluded that it was the faulty navigation which brought about the collision, and not a warlike operation.

We think the loss is one that must be sustained by the marine underwriter, and not by the war risk underwriter, and that the decree below must be affirmed.

ROGERS, Circuit Judge. I concur in the conclusion announced in the foregoing opinion.

MAYER, Circuit Judge (concurring). The District Court was of opinion that the collision resulted proximately "from poor navigation on the part of both vessels." It seems to me that neither vessel was legally at fault. If we assume that the District Court was right in ascribing fault to each vessel, yet such fault must be regarded as having been committed in extremis in a situation so unexpected, confusing, and exciting as to invite for its description the pen of a Conrad. If the case were unembarrassed by authority, I should say that the method of navigation prescribed by the naval authorities was the proximate cause of collision.

It is true that, so far as disclosed by the evidence, there is "nothing to show that Napoli or any other merchantman was compelled to go in convoy." Yet this, I think, refers more to form than to substance. If a merchantman had set out without convoy for a voyage through a known submarine-operated area, her owner or master would have been subjected to grave condemnation for the risk to life, as well as property, thus recklessly incurred.

There was a moral compulsion to seek convoy aid, equivalent, in war, to a compulsion in law. When, therefore, these vessels began their voyages in opposite directions, the flotilla in which each was grouped was under command of navigators from the top down, who knew nothing whatever of the existence or movement of the other flotilla. Why was this? Obviously, because of war necessity. In effect, the navigators were not free agents, so far as concerned their ability to anticipate, by the ordinary usages and precautions of navigation, the presence of the other convoyed vessels; and this going to sea, almost with closed eyes, was imperative for the delivery of cargoes vital to sustain the physical and economic life of allies and associates co-operating to defeat a common enemy. This war, perhaps more than any other, has emphatically demonstrated that the furnishing of munitions and supplies is as indispensable an operation of war as the movement of armies and navies. The point of the Ionides Case is found in the opinion of Byles, J., when he said:

"First the original meritorious cause (and in popular language the cause of the loss) was the captain's being out of reckoning. * * * The absence of the light was * * * merely the absence of an extrinsic saving power."

Thus impulse was given to the "aggravated marine peril" theory. But I think it is going far to extend that theory to the case at bar. The theory of this case should be that "a warlike operation" is not confined to actual offense, attack, or armed engagement, but may, in any event, comprehend a movement of vessels initiated in accordance with sovereign compulsion for the purpose of delivering munitions and supplies either to one's own country or to allies or associates. Of course, extravagant or fanciful illustrations may be advanced to show the extremes to which such a theory may be carried, with, it is contended, illogical results; but illustrations of that character are rarely helpful. Yet, whatever our own views may be, I think the District Court, per Hough, J., was right in recognizing the commercial necessity of following the Petersham and Matiana Cases, decided by the House of Lords by the narrow margin of three to two.

The questions in the case at bar are not local, but affect an important class of world-wide business, in which the relations are so interwoven and connected that it would be unfortunate and confusing if a court of less authority than the Supreme Court of the United States were to arrive at a result different from that reached by the House of Lords.

For that reason, I think the decree should be affirmed.