PANAMA TRANSPORT COMPANY,
Libelant,

v.

UNITED STATES of America,
Respondent.

UNITED STATES of America, as charterer, insurer and underwriter, and Socony-Vacuum Oil Company, Incorporated, as owner of THE S.S. MOBILGAS,
Libelants,

v.

PANAMA TRANSPORT COMPANY, and THE M.V. ESSO BALBOA, her engines, tackle, apparel, etc., Respondents,

PANAMA TRANSPORT COMPANY, as owner of the M.V. Esso Balboa,
Cross-Libelant,

v.

UNITED STATES of America, as charterer, insurer and underwriter, and Socony-Vacuum Oil Company, Incorporated, as owner of the S.S. Mobilgas,
Cross-Respondents.

Nos. A. 145–162, A. 146–265, A. 152–47.

United States District Court
S. D. New York.

July 26, 1957.

On Settlement of Interlocutory Decree
Aug. 16, 1957.

Kirlin, Campbell & Keating, New York City, for Panama Transport Co. and The Esso Balboa, Raymond T. Greene, and Stephen J. Buckley, New York City, of counsel.

Paul W. Williams, U. S. Atty., New York City, for Socony-Vacuum Oil Co., Incorporated and the United States, Gilbert S. Fleischer, Trial Atty., Dept. of Justice, Louis E. Greco, Washington, D. C., of counsel.

LEVET, District Judge.

These proceedings were brought as a result of a collision between the M. V. Esso Balboa and the S. S. Mobilgas off the north coast of New Guinea during the early morning of September 19, 1944. The matters were tried by the court. After hearing the testimony, examining the exhibits, briefs and pleadings, the following findings are hereby made:

### Findings of Fact.

1. At all times mentioned herein, libelant, United States of America, was, and still is, a sovereign, and at all such times was the charterer of the S. S. Mobilgas and also insured the libelant, Socony-Vacuum Oil Company, Incorporated, with respect to the S. S. Mobilgas against certain perils and risks, including collision.

2. At all such times libelant, Socony-Vacuum Oil Company, Incorporated, was and is a corporation organized and existing under and by virtue of the laws of the State of New York, and owner of the tanker Mobilgas, a vessel of 9,925 tons gross, 6,174 tons net register, 486.3 feet long, 68.3 feet in breadth, 36.9 feet deep and built in 1937.

3. Libelant, United States of America, has paid certain sums of money to libelant, Socony-Vacuum Oil Company, Incorporated, under its contract of insurance and has become subrogated to and has succeeded to and acquired pro tanto the rights of the assured, Socony-Vacuum Oil Company, Incorporated, against the M. V. Esso Balboa and Panama Transport Co. by reason of the collision hereinafter described.

4. At all times mentioned herein, cross-libelant, Panama Transport Company, was and still is, a corporation organized and existing under and by virtue of the laws of the Republic of Panama, and at all times hereinafter mentioned was, and still is, the owner and operator of the tanker M. V. Esso Balboa, a vessel of 9,553 tons gross, 6,000 tons net regis-

ter, 489 feet long, 66 feet beam, 36.3 feet deep and built in 1939.

5. At all such times the United States of America, through the War Shipping Administration, employed and operated the M. V. Esso Balboa under a requisition time charter, dated April 20, 1942 under which the charterer undertook to "provide and pay for or assume" insurance of "the full form of standard hull war risk policy of the War Shipping Administration, which shall include malicious damage, sabotage, strikes, riots, and civil commotion * * *."

6. Pursuant to said charter, the Director of Wartime Insurance, War Shipping Administration, acting for the United States of America, executed and delivered to the Panama Transport Company War Risks Binder F. C. No. 838, insuring the M. V. Esso Balboa against war risks only from the time of delivery of said vessel to the termination of said charter.

7. The full form of standard hull war risk insurance policy of the War Shipping Administration in force at the time of the issuance of said binder was incorporated therein by reference and contained an endorsement entitled, "War Risk Clauses," which provided in part as follows:

"It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty.

"This insurance is also subject, however, to the following warranties and additional clauses:

"The Adventures and Perils Clause shall be construed as including the risks of piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, floating and/or stationary mines and/or torpedoes whether derelict or not, and/or military or naval aircraft and/or other engines of war including missiles from the land, and warlike operations and the enforcement of sanctions by members of the League of Nations, whether before or after declaration of war and whether by a belligerent or otherwise; but excluding arrest, restraint, or detainment under customs or quarantine regulations, and similar arrests, restraints, or detainments not arising from actual or impending hostilities or sanctions."

8. During the early morning of September 19, 1944, shortly after 2:00 a. m., a collision occurred between the S. S. Mobilgas and the M. V. Esso Balboa off the north coast of New Guinea.

9. The night was pitch black and the weather was partly cloudy with an east southeast wind of about force 3; the sea was moderate.

10. In accordance with naval instructions, both vessels were proceeding blacked out and in opposite directions. The S. S. Mobilgas was sailing light and was steering a course of 170°T at a speed of about 13 knots. The M. V. Esso Balboa was loaded with a cargo of fuel oil and was steering on a course of 326°T at a speed of about 7½ knots.

11. The M. V. Esso Balboa was proceeding from Finschhafen, New Guinea to Seeadler Harbor, Manus Island, of the Admiralty Islands group. "Vessels from Finschhafen to Seeadler Harbor were, at the time of the collision, being instructed to proceed on a track which passed through the following positions:

"(A) 06°30'S. : 148°08'E. thence in a direction 325° to —
"(B) 05°33.8'S. : 147°29.8E. thence in a direction 355° to —
"(C) 02°54.2'S. : 147°15.7'E." (Exhibit 6)

12. On the early morning of September 19, 1944, the S. S. Mobilgas was proceeding from Seeadler Harbor to Finsch Harbor under naval instructions which required vessels making such trips at that time to proceed on a route which passed through the following positions:

"(L) 02°54′S. : 147°10′E. thence in a direction 175° to —
"(M) 05°35′S. : 147°25′E. thence in a direction 146° to —
"(N) 06°30′S. : 148°02′E." (Exhibit 6)

---

13. Pursuant to the above-mentioned reciprocal and parallel routes, the S. S. Mobilgas was to turn to the left to course 146°T at a point which was approximately 4 miles to the westward of where the M. V. Esso Balboa, under her instructions, was to turn to the right to course 355°T.

14. At 2:00 a. m. on the morning of September 19, 1944, the position of the M. V. Esso Balboa in the Vitiaz Strait was obtained by a dead reckoning fix. Navigation by dead reckoning depends upon the course made over the sea bottom and the distance run. The set or direction of the current affects the course of the ship made over the sea bottom. Moreover, the speed of the vessel, which is a factor in determining the distance run, is also affected by the current.

15. Although there was evidence that a northwest current of approximately 2 knots was running through the Vitiaz Strait at the time of the collision, the navigator of the M. V. Esso Balboa conceded that in plotting the track he made no allowance for the set and drift of the current.

16. The navigator of the M. V. Esso Balboa admitted that on the M. V. Esso Balboa's return trip to Finsch Harbor in following the reciprocal route of 146°, two changes in course, namely from 140° to 137° and from 137° to 132°, were made, possibly in order to turn the vessel more to the eastward so as to compensate for a westward carriage of the vessel by the current.

17. The fixes taken by the S. S. Mobilgas prior to the collision indicated that she was making a course of 179° instead of 175° as prescribed and, therefore, her course was altered to 170°T in order to compensate for the westward set of the current.

18. The evidence in these suits establishes that by failing to allow for the set or direction of the current the M. V. Esso Balboa overran the point where she was to turn to the right to course 355°T, and by straying from her fixed course under the naval instructions she thereby crossed the prescribed path of the S. S. Mobilgas at the point of collision.

19. In addition to a watch officer in the wheelhouse and two able-bodied merchant seamen, one stationed at the wheel and the other on the flying bridge, the other personnel on watch on board the M. V. Esso Balboa during the early morning of September 19, 1944, consisted of several members of a United States Naval Armed Guard unit. One Navy man was stationed on the flying bridge, another was in the gunner's tub, 10 or 15 feet directly behind the ship's bow, two Navy men were on the starboard side aft and one was stationed on the fantail. There was no merchant lookout stationed on the bow of the ship.

20. The S. S. Mobilgas was first sighted by the Navy man stationed on the flying bridge. He spotted a V-wake of another ship and saw the silhouette of the S. S. Mobilgas about a quarter of a mile away, or more. He went over and picked up the voice or speaking tube which ran from the flying bridge to the wheelhouse, but it was rusty and broke in his hand. The Navy man then ran down below to the wheelhouse and reported to the watch officer that he saw an object or ship 20 or 30 degrees off the starboard bow. The watch officer turned on the ship's lights and the Navy man returned to his post on the flying

bridge, where he observed that when the S. S. Mobilgas was about one and a half or two ships' lengths away she also turned on her running lights. Seconds later the two ships collided. The Navy man observed that the S. S. Mobilgas veered to the left several seconds before the collision and that M. V. Esso Balboa kept to her course.

21. The personnel on watch aboard the S. S. Mobilgas during the early morning of September 19, 1944, consisted of a watch officer on the bridge, a merchant seaman at the wheel, a merchant seaman on the starboard wind of the bridge, another merchant seaman on the stem of the ship, two Naval Armed Guardsmen in the forward gun tub and one on the flying bridge.

22. The M. V. Esso Balboa was first spotted by a Naval Armed Guardsman stationed in the forward gun tub on the bow of the S. S. Mobilgas when he observed with the use of his binoculars a black object one point off the port bow.

23. The man in the gun tub of the S. S. Mobilgas told the other member of the gun crew, who was also in the gun tub and who was wearing head phones, to report the object to the Navy man located on the flying bridge. It was the latter's duty to relay these reports to the watch officer on the bridge. The man with the phones repeated the report about six times. The Navy man on the flying bridge called back and asked for an identification of the sighted object, which was observed by the man in the gun tub to be getting bigger and bigger.

24. Suddenly the man in the gun tub saw the mast lights of the M. V. Esso Balboa go on and he heard one short blast of her horn. The collision occurred seconds later.

25. The watch officer of the S. S. Mobilgas was on the starboard wing of the bridge at about 2:10 a. m. on the morning of the occurrence when the man on the flying bridge reported an object one point on the port bow. At first he saw nothing, but when he looked through his binoculars he saw a white and then a green light go on. The watch officer

ordered the wheelman to turn hard right, which was immediately executed. He then turned on the ship's running lights. He heard one blast of the other ship's horn. Thereafter the collision ensued.

26. On November 27, 1946, Socony-Vacuum Oil Company, Incorporated, as owner of the S. S. Mobilgas and the United States, as charterer, insurer and underwriter, filed a libel against the M. V. Esso Balboa and her owner, the Panama Transport Company, for damages sustained as a result of the collision. On September 4, 1947, the Panama Transport Company, as owner of the M. V. Esso Balboa, filed a cross-libel against the Socony-Vacuum Oil Company, Incorporated, the United States and the S. S. Mobilgas to recover damages sustained in the collision. A third proceeding was commenced on September 18, 1946, when the Panama Transport Company filed a libel against the United States under the war risk insurance policy to recover for damages sustained.

27. The proximate cause of the collision and resulting damage was the navigational fault · on the part of the M. V. Esso Balboa.

28. The consequences of hostilities or warlike operations were not the proximate cause of the collision.

### Discussion.

The two basic issues to be determined are: (1) The cause of the collision; and (2) The scope of the war risk policy covering the M. V. Esso Balboa.

In considering the factors bearing on the cause of the collision, it first must be noted that the Panama Transport Company failed to maintain a merchant lookout on the bow of the M. V. Esso Balboa. Although a Navy gunner was stationed in the forward gun tub, located about 10 or 15 feet directly behind the bow, his function was primarily military in character. The fact that one of his duties was to check the sky, horizon and water for approaching enemy craft did not relieve the ship from stationing a merchant seaman on the bow with the sole duty of acting as forward lookout.

The failure to maintain a bow lookout was regarded as a contributing fault in United States v. The Adrastus, 2 Cir., 1951, 190 F.2d 883, at page 886, where the court said:

"It has long been well established law that when a ship, at the time of collision, is in violation of a statutory rule designed to prevent collisions, it is to be presumed that her fault was at least a contributing cause of it until, and unless, she can show not only that it was not such a cause but that under the circumstances it could not have been. The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148. Although no statutory rule requires the maintenance of a lookout in the bow of a ship, many decisions in our courts have established that as the proper place for one best to observe objects on or at the surface of the water. The Ottawa, 3 Wall. 268, 18 L.Ed. 165; Chamberlain v. Ward, 21 How. 548, 16 L.Ed. 211; The Colorado, 91 U.S. 692, 23 L.Ed. 379; The Sagamore, 1 Cir., 247 F. 743; The Choctaw, 6 Cir., 270 F. 114. The requirement that a lookout shall be kept as far forward as possible, especially if the visibility is poor, is so strict that the presumption of contributory fault arising from its neglect is the same as that created by the violation of a statute and must be overcome, if at all, by the same kind of proof showing that it could not have contributed to the disaster. The Madison, 2 Cir., 250 F. 850. As was said in The Buenos Aires, 2 Cir., 5 F.2d 425, 432, ' * * * the courts have held that good navigation makes it necessary that the lookout shall be stationed in the forward part of the vessel and at a point best suited for hearing and observing the approach of vessels and where his vision will be free from all obstructions.' "

Another factor worthy of note, although not of major significance, was the improperly maintained speaking tube. The Navy gunner on the M. V. Esso Balboa who spotted the approaching ship first attempted to report this fact to the bridge by means of the tube leading to the wheelhouse. When the tube fell apart in his hands, he was compelled to run down the ladder from the flying bridge to the main bridge in order to make his report, thus delaying the receipt of the report on the bridge.

■ However, the proximate cause of the collision was the M. V. Esso Balboa's failure to follow the route instructions, due to the fact that no allowance was made for the set and drift of the current while navigating by dead reckoning. The evidence establishes that had these factors been considered by the navigator in plotting his course, the M. V. Esso Balboa would not have crossed the path of the S. S. Mobilgas. In Petition of North Atlantic Transport Co., Inc., D.C. S.D.N.Y., 1948, 80 F.Supp. 308, Judge Leibell said:

"The Routeing Instructions have the same force as law, Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402; The Madiana, D.C., 63 F.Supp. 948; Tidewater Associated Oil Co. v. United States, D.C.S.D.Cal.1945, 60 F.Supp. 376; The Vernon City, 70 L.L.Rep. 279 at p. 290. Violation of these instructions by either vessel would burden it with the duty of showing that such violation could not have contributed to the collision. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148." (80 F.Supp. at page 313.)

■ There was no proof that the S. S. Mobilgas also strayed from her prescribed course or that the hard right which was ordered by her watch officer seconds before the collision contributed in any way to the occurrence. Accordingly, I conclude that the M. V. Esso Balboa was solely at fault. Even if the hard right turn were not the proper navigational maneuver under the circumstances, it would not result in contributory fault on the part of the S. S. Mobilgas, since the rule as stated in The Mag-

gie J. Smith, 123 U.S. 349, 88 S.Ct. 159, 31 L.Ed. 175, is as follows:

" * * * 'if one vessel is brought into immediate jeopardy by the fault of another, the fact that an order other than that which was given might have been more fortunate will not prevent the recovery of full damages;' or, as stated by the Court of Appeal of England, in the case of The Bywell Castle, 4 Prov.Div. 219, as quoted in the case of The Elizabeth Jones, 112 U.S. 514, 526, 5 S.Ct. 468, [28 L.Ed. 812], 'Where one ship has, by wrong manoeuvres, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been manoeuvred with perfect skill and presence of mind.' " 123 U.S. at pages 355–356, 8 S.Ct. at page 162.

See also The Lafayette, 2 Cir., 1920, 269 F. 917. In The Ruchamkin, D.C.E. D.Va., 1956, 141 F.Supp. 97, at page 103, this point was stated as follows:

" * * * Both vessels exerted themselves to the utmost to avoid collision after their presence was mutually disclosed. From that moment no negligence can be laid to either. Although 'right hard rudder' by the Ruchamkin might have saved her, it is doubtful; her master was acting in extremis and he must not be judged too nicely. * * * "

■■ Having determined that the M. V. Esso Balboa was at fault, its contention that the collision occurred as a result of an inevitable accident cannot obtain because "it is only when the disaster happens from natural causes, and without negligence or fault on either side, that the defence set up in this case can be admitted. Inevitable accident, as applied to cases of this description, must be understood to mean 'a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident.' * * * "

The Union Steamship Company of Philadelphia v. The New York & Virginia Steamship Co., 24 How. 307, at page 313, 65 U.S. 307, at page 313, 16 L.Ed. 699.

■ In order for the Panama Transport Company to recover damages against the United States under the war risk insurance policy covering the M. V. Esso Balboa, it must prove that the collision and all the resulting losses were consequences of hostilities or warlike operations. The word "hostilities" has been described as meaning "an actual operation, offensive or defensive, in the conduct of war," and the term "warlike operations" as meaning "operations in time of war." Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., 2 Cir., 1922, 282 F. 976, at page 979, affirmed 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402. There the two ships involved were sailing under separate convoy without lights and carrying war supplies. The Court of Appeals held that the war risk insurance clause did not apply and said:

" * * * The peril must be due directly to some hostile action, if it be considered a warlike risk. If the peril be a maritime risk, and is but aggravated or increased by the operation relied upon as a warlike operation, then the risk is not a war risk. British S. S. v. The King, [1921] A.C. 99, 133. * * * [282 F. 979.]

"Therefore we conclude that sailing without lights was neither a warlike operation nor was it the consequence of one. The reason for sailing without lights was due to the submarine peril, but the collision was due to faulty navigation, which cannot be said to be the proximate consequence of the failure to have lights. It appears that the lights were turned on just before the collision as the convoys met. * * * " 282 F. 980.

In Standard Oil Company of New Jersey v. United States, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68, the Supreme

Court affirmed the Court of Appeals, holding that a war risk insurance policy does not as a matter of law cover a loss resulting from a collision during wartime between an insured steam tanker and a Navy mine sweeper engaged in mine sweeping operations. The Court of Appeals, 2 Cir., 178 F.2d 488, at page 492, stated that "it is not enough that a vessel merely be engaged in warlike operations, but the dominant and effective cause of the loss must be the warlike character of the operation."

■ In the instant case the dominant and effective cause of the loss was faulty navigation on the part of the M. V. Esso Balboa which brought her into the path of the S. S. Mobilgas. Thus, where faulty navigation is the proximate cause of a collision between two vessels engaged in warlike operations, the war risk insurance will not cover the resulting loss. This point was clearly illustrated in Esso Standard Oil Co. v. United States, D.C.S.D.N.Y., 1954, 122 F.Supp. 109, 111, affirmed 2 Cir., 221 F.2d 805, wherein Judge Murphy observed as follows:

"Both vessels were carrying cargoes for use by military forces, had been in convoy and at the time of collision were proceeding through an opening in an anti-submarine net pursuant to naval orders. It would be obtuse to insist that the operation in question had no more connection with hostilities or war than two yachts drifting together in a narrow channel in some serene bay off a peacetime Côte d'Azur. It would be equally blind to characterize the operation as no different in warlike nature than that of naval craft actually sweeping mines.

"Whatever the precise meaning of the oft-used phrase 'hostilities and warlike operation', the cases defining it have long since made clear that merely a causal connection between a state of war and the movement of a cargo vessel is not sufficient to consider such risk within its language. We are told that ' "hostilities" is intended to describe an actual operation, offensive or defensive, in the conduct of war, and "warlike operations" as operations in time of war. The peril must be due directly to some hostile action, if it be considered a warlike risk.' Clearly, it is not enough that the event have as one of its characteristics a 'warlike' nature; in addition, that warlike quality must be a primary or principal characteristic of the operation. It is seriously questioned in the instant case whether the belligerent characteristic predominates. It would appear more likely, from the viewpoint of the collision, that the navigational aspect and not the martial one is dominant.

"Assuming, however, arguendo that the operations were 'warlike', it is clear as a question of fact that the collision was not a 'consequence' or such 'hostilities' in the sense that such 'warlike operations' were its proximate cause. The John Worthington [United States v. Standard Oil Company of New Jersey, D.C.S. D.N.Y., 81 F.Supp. 183, reversed 2 Cir., 178 F.2d 488, affirmed 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68] was a case stronger on its facts than the instant one since in the collision between that tanker and a minesweeper, it was conceded that the minesweeper was engaged at the time in 'warlike operations', viz., sweeping mines, something that has not been found in the instant case. Nevertheless, the appellate court reversed the trial judge's conclusion that such warlike operation was the proximate cause, and the Supreme Court refused on review to disturb this resolution of a question of fact. Far from any factual distinction compelling a different result, the instant situation presents an a fortiori case." 122 F.Supp. at pages 111–112.

Conclusions of Law.

1. This court has jurisdiction of the subject matter and the parties.

2. The M. V. Esso Balboa was solely at fault in the collision with the S. S. Mobilgas.

3. The United States is entitled to an interlocutory decree against the Panama Transport Company for the damages sustained as a result of the collision, together with interest and costs. The amount of the damages is to be determined by a special master to whom this matter is to be referred for such purpose.

4. The cross-libel of the Panama Transport Company is dismissed.

5. The libel of the Panama Transport Company against the United States for indemnity under the war risk insurance covering the M. V. Esso Balboa is dismissed.

On Settlement of Interlocutory Decree.

On the settlement of the interlocutory decree in the above-entitled suits the question of *interest* has been raised by Panama Transport Company, whose libel against the United States of America as charterer is to be dismissed, and against which the libel of the United States for collision damage is sustained. In the opinion of this court the entire responsibility here was that of Panama.

 The collision occurred on September 19, 1944. The government filed its libel on November 27, 1946, two months after Panama had filed its war risk libel (A. 145–162) against the United States. Panama answered on September 4, 1947, and set up its claim against the United States on account of the collision. The case was tried in May 1957 and decision rendered on July 26, 1957.

Panama contends that this delay should eliminate or reduce its payment of interest. The government seeks full interest.

The occasions for the delays after filing of the suits appear to be as follows:

1. On May 3, 1950, the case came on for a pre-trial hearing. Apparently, the government sought delay by reason of the pendency of a war risk case involving similar issues to the war risk libel herein, to wit, Standard Oil Company of New Jersey v. United States, 2 Cir., 1949, 178 F.2d 488. Proctors for both parties here appear to have acquiesced at this time in a return of the case to the trial calendar pending the outcome of the test case mentioned.

2. On March 26, 1951, a stipulation drawn by Messrs. Kirlin, Campbell & Keating was filed by the court marking the case off the calendar but subject to being restored by either party on thirty days' notice. It does not conclusively appear at whose request that step was initiated. At any rate both consented.

3. On June 25, 1953, on call for pre-trial hearing the case was adjourned to November 5, 1953, apparently during pendency of the Henderson and Senior war risk cases which were ultimately settled by a consent decree on June 28, 1954.

4. Soon after March 25, 1954, settlement became unlikely and in September, 1955, depositions of witnesses began. This continued in 1956 and the case was put on the trial calendar by stipulation and was tried in due course.

Thus it seems that (a) the government delayed suit for two years, two months to November 27, 1946; (b) Panama delayed its cross-libel until May 7, 1947; (c) both parties appear to have acquiesced in the delay to September, 1955, when the taking of depositions in certain points became active.

Since the government concedes that shortly after March 25, 1954 it became evident that trial was inevitable, the burden of pressing the case for trial rested upon the United States.

 The allowance of interest is not an absolute right. It rests on the discretion of the trial tribunal. The Scotland, 1886, 118 U.S. 507, 518, 6 S. Ct. 1174, 30 L.Ed. 153. A libellant's delay in bringing a cause to a final determination justifies the court in exercising its discretion in disallowing interest or allowing it for a lesser time than for which it would normally be allowed. The North America (The F. C. Pendleton), U.S.D.C.S.D.N.Y., 24 F.2d 846, 1928 A.

M.C. 659, 661; Pennsylvania R. Co. v. Downer Towing Corp., 2 Cir., 1926, 11 F.2d 466.

The government did delay its bringing of the action; Panama consented to certain delays. There may have been a motive since Panama sustained the lesser damages. The control appears to have been mainly in the government. Under the circumstances, interest for a period of two years in starting the action is eliminated and interest for one year during the period of preparing for trial is also eliminated. Interest from September 19, 1944 to the date of entry of the final decree, less a period of three years, is hereby determined to be fair and reasonable under the discretion permitted.

See The Nockum, U.S.D.C.S.D.N.Y., 1929 A.M.C. 1729.

The decree in the libel and cross-libel in the collision cases should be in the consolidated form submitted by Panama. See Lehigh & Wilkes-Barre Coal Co. v. Hartford & N. Y. Transportation Co. (The Plymouth) etc., 2 Cir., 1915, 227 F. 1019, certiorari denied 241 U.S. 675, 36 S.Ct. 725, 60 L.Ed. 1232; France & Canada S. S. Co. v. French Republic, 2 Cir., 1922, 285 F. 290; The Schooner Dragor, U.S.D.C.S.D.N.Y., 1924 A.M.C. 995.

*As to costs*, the government in the war risk insurance action (A. 145–162) has included in its taxation of costs and disbursements certain items as follows:

### Costs

Proctor's fee, $2.50 for each 5 depositions read on trial......$ 12.50

### Disbursements

Commissioner's fees taking depositions de bene esse.........$179.93
Stenographer's notes of trial............................ 34.00
Witness' fees (etc.)..................................... 24.00
 20.00

---

The above depositions taken and used, the testimony of the witnesses mentioned and the minutes of the stenographer related almost entirely, if not completely, to the issues in the collision cases (A. 146–265, A. 152–47). Therefore, it is more realistic to tax the above-referred to items of costs and disbursements in the collision cases. I so direct.

Accordingly, let the costs and disbursements in the war risk case (A. 145–162) be retaxed in accordance herewith.

The government is to resubmit decrees, settled upon notice, (1) in A. 145–162; (2) in A. 146–265 and A. 152–47, in the form sought by Panama but as herein directed, including therein the provisions as to interest as above stated. Costs and disbursements in the consolidated collision actions are to be taxed in the final decree.